**PARGAS, INC., a Maryland Corporation**

v.

**EMPIRE GAS CORP., a Missouri Corporation, et al.**

**Civ. No. K–76–676.**

United States District Court, D. Maryland.

June 9, 1976.

Calvin H. Cobb, Jr. and Steptoe & Johnson, Washington, D. C., and Jos. H. H. Kaplan and Venable, Baetjer and Howard, Baltimore, Md., for plaintiff.

Robert S. Pirie and Skadden, Arps, Slate, Meagher & Flom, New York City, and George Beall and Miles & Stockbridge, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Pargas, Inc. (Pargas) instituted this suit on May 7, 1976 seeking to restrain defendant Empire Gas Corporation (Empire) and other defendants alleged to be "controlling persons" of Empire[1] from consummating a tender offer made by Empire on May 7, 1976 for a minimum of 850,000 shares and a maximum of 2,000,000 shares of Pargas' common stock, *i. e.,* for a minimum of 25.5% and a maximum of 60% of Pargas' said stock. The stock of both Pargas and Empire is traded on the New York Stock Exchange. Pargas alleges that Empire's

---

[1]. *See* 15 U.S.C. § 78t.

Note: By inadvertence the word "defendant" is sometimes used herein where "defendants" is intended.

tender offer violates disclosure requirements of sections 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(d), (e); that Empire obtained its financing for said tender offer in violation of Regulations T and/or X of the Federal Reserve Board, 12 C.F.R. §§ 220, 224 (1976) and of section 7(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g (the Regulations issues); and that successful consummation of the tender offer by Empire would result in violations of section 2 of the Sherman Act, 15 U.S.C. § 2, and of section 7 of the Clayton Act, 15 U.S.C. § 18. Jurisdiction in this proceeding in which Pargas asks for damages as well as injunctive relief exists pursuant to 15 U.S.C. §§ 15, 26 as well as under 15 U.S.C. § 78aa.

■ In the course of these proceedings, counsel for defendants brought to this Court's attention the fact that plaintiff's complaint in this case, plaintiff's brief in support of its motion for preliminary relief herein, and possibly one or more other materials had been distributed by or on behalf of plaintiff (see Tr. of 5/12/76 at 170–83) in alleged violation of section 14(d)(4) of the Securities Act of 1934 and of one or more of the rules of the Securities and Exchange Commission, and moved for injunctive relief in connection with that claim. However, after the affidavits and representations of certain of counsel for plaintiffs indicated that neither plaintiff nor its counsel had acted in bad faith in disseminating the above-referenced materials, and after plaintiff and its counsel undertook to cease any further such disseminations and to recall, to the fullest extent possible, any materials which had to date been disseminated, counsel for defendants indicated that defendants would not press any quest for immediate relief in connection with that alleged violation. However, defendants did reserve the issue for further consideration at trial, and also asked that it be considered as a factor in the balancing of equities in the context of plaintiff's quest for preliminary relief. (Tr. of 5/17/76 at 480–82). This Court, in so doing herein, concludes that that factor should be and accordingly herein is afforded little weight.

On May 7, 1976, Empire's tender offer was publicly announced. On that date, also, plaintiff instituted the within proceeding, and moved for immediate relief. Further, on that same date, counsel on both sides conferred with the Court and agreed to an expedited schedule for discovery, briefing, and oral argument. That schedule culminated in lengthy hearings on May 12, 1976 and May 13, 1976. Because Empire's tender offer was scheduled to expire at 10:00 A.M., Chicago time, on May 18, 1976, this Court, as requested by counsel, rendered on May 17, 1976 an oral opinion in which, for reasons then stated at length, this Court determined that Pargas had established a sufficient probability of violations of the federal securities and antitrust laws, and had also demonstrated that the balancing of the equities entitled plaintiff to some form of preliminary relief. At that time this Court reserved for subsequent determination the question of whether Pargas is also entitled to preliminary relief in connection with the Regulations issues.

Subsequently, during the afternoon and early evening of May 17, 1976, this Court and counsel explored the possibility of devising an appropriate intermediate order which would not have the practical effect of depriving Empire, if it ultimately succeeded in its defense of the within suit, of its opportunity to attempt successfully to consummate its tender offer, but which would insure to Pargas and Empire that the "status quo" would be maintained as fully as possible during the pendency of this litigation. Defendant's counsel took the position that while it disagreed with the Court's conclusion that any preliminary injunctive relief should be granted, it did not desire to appeal from that determination as such. However, defendant's counsel stressed that any preliminary decree which halted Empire's pursuit of its tender offer and which would in Empire's opinion cause it to lose the opportunity to succeed in its tender offer venture, whether or not Empire prevailed in this litigation, would be a decree in connection with which Empire would seek the fastest possible appellate review.

Plaintiff's counsel at first contended that nothing short of an absolute immediate halt of all Empire activities in pursuance of the tender offer was acceptable to Pargas, regardless of whether that would result, in practical effect, in killing the tender offer even if Empire ultimately won a victory in this case. However, after this Court instructed counsel on both sides to try to find a meeting point and to attempt to establish middle ground, counsel jointly agreed upon and presented to this Court in the evening of May 17, 1976 the preliminary decree which this Court signed and which bears that date. Thereafter, on May 26, 1976, that May 17, 1976 Order was extended by a further Order dated May 26, 1976.[2]

Between May 17, 1976 and June 1, 1976, counsel conferred among themselves, filed further memoranda with this Court, and conferred further with this Court. All conferences with this Court were on the record, except for certain telephone conferences instituted by one or more of counsel but involving always counsel on both sides. After the lengthy public proceedings on May 12, May 13 and May 17, 1976, culminating with this Court's delivery of its lengthy oral opinion on that latter date, and to and including June 7, 1976, all proceedings on the record in this case have been held in chambers. That procedure was followed with the agreement of all counsel because, *inter alia,* of the possible effect of argument and even tentative expression of views by counsel and Court upon the market behaviors of the stock of Pargas and Empire during such proceedings.

Between May 17, 1976 and June 1, 1976, this Court continued to urge counsel to consider all factors including the percentage of stock which Empire might be permitted to acquire pursuant to its tender offer during the pendency of this suit, the conditions to govern the freezing and the non-voting of any such stock by Empire or anyone other than a neutral person appointed by the Court during such pendency; preservation of the right of any stockholder who tendered and/or sold his stock during that pendency to withdraw his tender and, if he had sold his stock, to reacquire it at the tender price in the event Pargas ultimately prevailed herein and Empire's tender offer should be fully and finally proscribed; conditions to govern the ultimate disposal, in that latter event, on a controlled basis of any Pargas stock not so withdrawn and/or not so reacquired by Pargas' stockholders so as to cause a minimum of damage to the financial and operating positions of Pargas and the market price of its stock; and arrangements for accelerated discovery and trial of all issues herein.[3] During that period, counsel for defendants expressed optimism that an appropriate and equitable middle ground could be found. On the other hand, counsel for plaintiff expressed great pessimism within 72 hours after this Court's May 17, 1976 Order was entered during the evening hours of that date. At that time and thereafter, Pargas stated its fears of the possibility that if Pargas won this suit, there would exist a large bloc of its stock which would require disposal and that such disposal, even if it took place on a carefully controlled basis as to both times and amounts, would seriously impede Pargas' operations and growth both during the course of these proceedings and thereafter, even if Pargas ultimately prevailed herein, until all or most of such stock was disposed of. Pargas stated additionally its further fears that such uncertainty would put pressure upon Pargas' current stockholders to accept Empire's tender offer. Pargas and its financial advisors, in affidavit and deposition testimony, have stressed that if any such large bloc of stock existed, there would be uncertainty until its ultimate disposal as to who would buy it, whether it would be acquired by one purchaser, and whether

---

2. Copies of those two Decrees are appended hereto as Appendices A and B. [At the request of the Court appendices C, D, E and I have been omitted and only a portion of Appendix H has been published.]

3. Counsel on both sides agreed upon a non-jury trial and expressed their joint hopes that the length of discovery and of trial could be expedited by cooperation of counsel, use of depositions and affidavits at trial, and the like.

such acquisition would result in such purchaser gaining control of Pargas and thereafter causing a change in Pargas' management personnel. Pargas also noted the probable adverse effect of such uncertainty upon the market price of Pargas' stock. Pargas thus pointed out that such uncertainty would leave Pargas' current management, employees, customers and existing and potential financial sources in a state of confusion and lack of confidence, impede Pargas operations and financing, and seriously and adversely affect its non-tendering stockholders, up to and including not only the date of a final judgment Order in this case but also after that judgment were entered, even if it were in favor of Pargas, until the bloc of stock acquired by Empire pursuant to Empire's tender offer was disposed of. The thrust of Pargas' position was that while Empire might lose a large sum of money, i. e., the difference between the tender offer price and the ultimate disposal price of any such large bloc of stock and also incur heavy administrative and legal costs, Pargas, even if it were the ultimate victor, would be permanently and greatly damaged.

In that connection, for purposes only of the motion for preliminary injunctive relief, this Court finds the following facts:

1. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that Pargas' ability to obtain equity and debt financing will be impaired. This would occur even if Pargas ultimately prevailed on the merits. [Affidavit of B. F. New, (hereinafter "New Aff.") Ex. D, Plaintiff's Memorandum With Respect to Proposed Relief (hereinafter "Pargas Memorandum III"); Affidavit of Martin Alan Siegel, (hereinafter "Siegel Aff.") Ex. C, Pargas Memorandum III.]

2. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, there exists a substantial probability that the value of Pargas stock will be depressed for some period of time. This would occur even if Pargas ultimately prevailed on the merits. [Siegel Aff., supra.]

3. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that Pargas will experience some difficulty in retaining and holding management. This would occur even if Pargas ultimately prevailed on the merits. [Siegel Aff., supra.]

4. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that the future management and control of Pargas will remain uncertain. This would occur even if Pargas ultimately prevailed on the merits. [Siegel Aff., supra.]

5. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that Pargas' employees will to some extent be demoralized, to the detriment of Pargas' business operations. This would occur even if Pargas ultimately prevailed on the merits. [Affidavit of J. W. Curtis (hereinafter "Curtis Aff."), Ex. F, Plaintiff's Reply to "Defendants' Memorandum In Support of its Proposed Order" (hereinafter "Pargas Memorandum IV").]

6. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that there will be created a present incentive for Pargas shareholders to tender, to the detriment of the status quo and the public interest. This would occur even if Pargas should ultimately prevail on the merits. [Siegel Aff., supra.]

7. If Empire is allowed to purchase Pargas shares pursuant to this tender offer pending a final resolution at trial of all factual and legal issues, a substantial probability exists that non-tendering Pargas stockholders will be forced to suffer uncer-

tainty as to ultimate control of the company, relative illiquidity in a depressed market for Pargas shares, the business disadvantages of demoralizing Pargas' labor force, the business disadvantages in Pargas' inability to effectively obtain equity or debt funding, and the business disadvantages of Pargas' inability to retain and hold management. These injuries would likely occur even if Pargas ultimately prevailed on the merits. [Siegel Aff., *supra;* New Aff., *supra;* Curtis Aff., *supra.*]

The possibility of Empire being permitted to continue its tender offer during the pendency of this suit and to consummate the purchase of a limited percentage of Pargas' stock, not to exceed an agreed percentage thereof, which percentage would not be so large as to cause Pargas and its non-tendering stockholders the injuries feared by Pargas and recited *supra,* with any such stock to be subject to neutral control until final judgment herein, was explored in depth by this Court with counsel. However, Empire was and is not today willing to accept a percentage limitation of less than 60%[4] or seemingly even to consider less than 35% and Pargas was and is today unwilling to state any acceptable percentage figure and has flatly opposed and continues to oppose any figure as high as 35%. In that context, Court and counsel agreed on June 1, 1976 and continue to agree today that an impasse had and has been reached. Pargas asked on June 1, 1976 for a decree substantially in the form entered by this Court on June 2, 1976. Empire pointed to the word "purchase" in this Court's May 17 and May 26, 1976 Orders

and contended on June 1, 1976 that traders had bought and sold Pargas stock on the New York Stock Exchange since May 17, 1976 on the assumption that the tender offer would remain open during the pendency of this case and that any device proscribing further such purchases and sales during the pendency of this litigation would be unfair to such persons.[5] From the point of view of 20–20 hindsight, this Court—and of course counsel for Pargas—would employ, as of May 17, 1976 or as of May 26, 1976, different language both in form and in substance than appears in the Orders bearing those dates.[6] But as of June 1, 1976, faced with (1) its determination that there was a substantial possibility that Pargas would ultimately, on the merits, obtain total injunctive relief herein on antitrust grounds and perhaps also because of the Regulations issues, and that such relief might proscribe entirely the consummation of Empire's tender offer, and with (2) the damages which Pargas and its non-tendering stockholders might well suffer on a continuing and even permanent basis, even if Pargas should prevail ultimately herein, if Empire is permitted to acquire (no matter what conditions might be placed upon such acquisition) and later be required to dispose of a bloc of stock of Pargas as large as 35%, and with (3) Empire's refusal to consider any substantially smaller percentage even if this Court adopted a percentage figure over Pargas' opposition, this Court, balancing and weighing all considerations and factors, entered its June 2, 1976 Order. Pursuant thereto, at 11:40 A.M. on June 2, 1976, this Court issued a preliminary injunc-

---

4. Both sides agree that Pargas' current management does not "control" in excess of 20% of its stock. However, Empire asserts that Pargas' current management may control up to and including in excess of 40%, if certain shares of Pargas stock held by certain persons whom Empire indicates may be under the control of the current management of Pargas are included.

5. Pargas stock did drop several points following the entry of this Court's June 2, 1976 Order.

6. The Order should have indicated, at the least, the possibility of a limitation on the numbers of

tendered shares Empire would be permitted to pay for and take title to, during the pendency of this litigation. The importance of the possible all-inclusive meaning of the word "purchased" as used in the first line of paragraph 2C of the May 17, 1976 Order was not noted by this Court during the evening of May 17, 1976. Nor was it referred to that evening by any of counsel when they presented that Order. Further, Pargas' counsel has stated that the importance of that word did not come upon them until they had consulted with one or more of Empire's financial advisors after May 17, 1976.

tion [7] enjoining Empire from taking any steps in furtherance of its original tender offer, and indicating that a final and appealable Order to that effect would be entered as soon as this Court determined the amount of a penalty bond appropriate in this case and entered further findings of facts and conclusions of law in accordance with this Court's earlier statements in the course of the oral opinion delivered on May 17, 1976 (Tr. at 455) that it reserved the right to write an opinion, either in whole or in part, in substitution for or in addition to said oral opinion. The within opinion is such a substituted Opinion, written after this Court, subsequent to June 1, 1976, afforded counsel on both sides the further opportunity to persuade this Court, through written submissions to and including 10:00 A.M. on June 8, 1976 and through further oral argument on June 7, 1976, that this Court's views expressed on June 1, 1976 were in one or more respects erroneous.

Defendant's counsel announced on June 1, 1976 an intention (in the event this Court did not alter any of the conclusions so expressed by it on June 1, 1976 and/or in the event this Court determined one or more of the Regulations issues, which this Court had not previously decided, adversely to defendant) to appeal from the refusal of this Court to enter an Order permitting Empire to continue to purchase, pay for, and take title to up to 60% of the stock of Pargas, under an amended tender offer and pursuant to carefully prescribed conditions, during the pendency of this litigation. At the same time, defendant's counsel stated that an expedited appeal from this Court's final decision herein would be particularly requested by defendant in the light of Maryland's new anti-tender statute which became law on May 17, 1976 and which by its own terms takes effect on July 1, 1976.[8] That new law seemingly does not proscribe Empire's tender offer or any reasonably contemplated amended tender offer. How-

ever, it would appear to require submission to, and approval by, Maryland's Securities Commissioner of any tender offer not consummated by July 1, 1976. Empire fears the delays which might result therefrom. However, this Court does note that Empire has expressed willingness to amend its tender offer to meet any and all disclosure requirements imposed by this Court. Indeed, defendant's counsel has advised this Court that Empire will, if it is permitted to continue to pursue its tender offer during the course of this litigation, amend its tender offer to comply with any and all reasonable disclosure requirements imposed by this Court, without appealing from the same. Additionally, defendant's counsel has stated that Empire stands ready to enter into new financing arrangements completely in accord with all applicable laws and regulations, if this Court will permit Empire to make and pursue an amended tender offer pending determination in this case. of the question of whether the consummation of Empire's tender offer can or cannot withstand the Sherman Act and/or Clayton Act attacks mounted herein by Pargas. However, Empire has not presented any details of such substitute financing nor any basis for enabling this Court to conclude that Empire could conclude such new financing arrangements, amend its tender offer and consummate the same by July 1, 1976 or by any later date.

### Preliminary Injunctive Standards

In *Elco Corp. v. Microdot, Inc.*, 360 F.Supp. 741, 746 (D.Del.1973), Judge Stapleton wrote:

Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes this Court to grant relief against a threatened violation of the antitrust laws "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts

---

7. Appendix J hereto.

8. A copy of Maryland Senate Bill 944 which became law on May 17, 1976 is appended hereto as Appendix C. The first mention to this Court of that bill or law by counsel on either side, and this Court's first knowledge of the same, occurred when reference to it was made orally by counsel during the June 1, 1976 proceeding.

of equity . . .". Thus, while "injunctive relief is particularly suited to the preventive function of § 7,"[1] the rules

[1] *Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc.,* 294 F.Supp. 1263, 1265 (D.Del.1969).

relating to the prerequisites for preliminary and permanent injunctive relief in Section 7 cases do not differ materially from those applicable in other areas. Where preliminary injunctive relief is sought the Court must weigh the potential of irreparable harm to the plaintiff absent judicial intervention, the potential of irreparable harm to the opposing party from judicial interference, the potential harm to the public interest and the likelihood of the plaintiff's prevailing on the merits. *Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc.,* 414 F.2d 506 (3rd Cir. 1969); *Winkleman v. New York Stock Exchange,* 445 F.2d 786 (3rd Cir. 1971); *Nelson v. Miller,* 373 F.2d 474 (3rd Cir. 1967).

In the *Allis-Chalmers* case, the Third Circuit discussed the plaintiff's burden as follows:

Recognizing that preliminary relief is a serious remedy, and because application for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the courts have required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted. Note, 40 N.Y.U.L.Rev. 771, 778 (1965).

\* \* \* \* \* \*

The burden so imposed is warranted by the extraordinary nature of the relief which is sought. But I am also mindful of the fact that it is preliminary relief which is being requested, and if the moving party establishes a reasonable probability of a § 7 violation the "possibility that the court may decide the right to permanent relief adversely to plaintiff does not preclude it from granting the temporary relief \* \* \*." . . .

In *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532, 539–40 (D.Del.1975), Judge Stapleton also expressed the following views, in connection with a quest for preliminary relief in connection with a tender offer:

THE APPLICABLE LEGAL STANDARDS.

The parties are in substantial agreement about the legal standards to be applied in considering the applications now before the Court. First, they agree that in order to be entitled to a preliminary injunction, a movant must show:

either a combination of probable success on the merits and the possibility of irreparable injury *or* that plaintiff has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for further litigation and deliberations. Plaintiff must also show that the balance of equities sharply weighs in its favor. *Ronson Corp. v. Liquifin Aktiengesellschaft,* Civ. 785–73 (D.N.J.), aff'd, 483 F.2d 846 (3rd Cir. 1973), cert. denied, 419 U.S. 870 [95 S.Ct. 129, 42 L.Ed.2d 108] (1974).

See also *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692 (2d Cir. 1973); *Elco Corp. v. Microdot, Inc.,* 360 F.Supp. 741, 746 (D.Del.1973).

Further, the parties agree that the Court must weigh "the balance of the equities" and, in doing so, must consider more than the potential of injury to the movant. \* \* \*

Finally, the parties agree, in general at least, with the advice offered by Judge Friendly in the following two quotations from *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 (2nd Cir. 1969):

Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an

unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. *These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality.*

*Id.* at 948 * * * [emphasis by Judge Stapleton].

* * * * * *

. . . [W]e think that in administering § 14(d) and (e), district judges would do well to ponder whether, if a violation has been sufficiently proved on an application for a temporary injunction, the opportunity for doing equity is not considerably better than it will be later on. The court will have a variety of tools usable at that stage. If the filings are defective or the tender offer misleading, the court can [for example] require correction, along, of course, with an opportunity to withdraw . . . . .

*Id.* at 947.

In *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232, 235–36 (4th Cir. 1971), while not in the context of a tender offer case or in connection with antitrust or federal securities questions, Judge Winter laid down the following general principles with respect to preliminary injunctive relief:

The decision to grant a preliminary injunction is discretionary with the district judge and may not be set aside on appeal unless an abuse of discretion is shown. *Singleton v. Anson County Board of Education,* 387 F.2d 349 (4 Cir. 1967); *Meiselman v. Paramount Film Distributing Corp.,* 180 F.2d 94 (4 Cir. 1950); *Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d 42 (4 Cir. 1932). The factors to be considered by the district judge have long been settled in this circuit:

[I]t is sufficient if the court is satisfied that there is a probable right and a probable danger and that the right

may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant * * * *Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d at 45.

As the above quotation indicates, it is not necessary that Conservancy demonstrate an absolute right to the relief it seeks in order to sustain the issuance of this preliminary injunction; it need establish only "probable right." It is apparent that Conservancy has raised substantial issues concerning the application of recent federal conservationist legislation to the administration of the National Forest system. Such issues are of great current public concern. They should be fully developed and litigated at the trial level in order to insure their proper resolution. It is at that stage that the various defenses raised by Dorrell should be asserted. While we express no opinion on these questions on their merits, we can say that their resolution is not immediately apparent. That is enough to say that Conservancy has not embarked on frivolous litigation, and thus interlocutory relief is not improper if Conservancy can also show a need for protection which outweighs any probable injury to Dorrell.

* * * * * *

The public interest is also a relevant consideration. *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Huard-Steinheiser, Inc. v. Henry,* 280 F.2d 79 (6 Cir. 1960). Usually the public interest comes into play when an injunction is sought to restrain enforcement of a statute or a regulation designed to further the public interest, and then it is sometimes concluded that a private party must suffer the risk of irreparable injury rather than to restrain the enforcement of that which, although it may be later determined to be invalid, is designed to further the public good. * * *

The district judge did not abuse his discretion in issuing the preliminary in-

junction. In deference to the position of the defendants, however, we suggest that the district court proceed to a final determination on the merits as expeditiously as practicable.

*See also Conservation Council of North Carolina v. Costanzo*, 505 F.2d 498, 502 (4th Cir. 1974); *Stark v. New York Stock Exchange*, 466 F.2d 743, 744 (2d Cir. 1972), and authorities cited thereat; *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

■ Under the applicable standards—standards which have in and of themselves not been the subject of dispute in this case—it is not necessary for a plaintiff seeking preliminary injunctive relief to establish an *absolute* right to the relief he seeks. Rather, a plaintiff need establish only a "probable right" to relief, and to demonstrate that his need for protection outweighs the probable injury to defendants which would result from the grant of such relief. For reasons which will be explicated more fully *infra*, this Court concludes that with regard to each of the claimed violations of the federal securities and antitrust laws and also with regard to the Regulations issues, plaintiff has demonstrated the existence of "substantial issues concerning the application of * * * federal * * * legislation * * * of great current public concern" and amply demonstrated the *probable* right to relief, and assuredly has not "embarked upon frivolous litigation", as those words were used by Judge Winter in *West Virginia Highlands*. Further, on the basis of evidence presented to this Court to date, plaintiff has also demonstrated a need for preliminary injunctive protection which outweighs any probable injury defendants may suffer from the grant of the same to plaintiff. *See* the findings set forth *supra*. In that connection, it is apparent herein that this Court's decision to award preliminary injunctive relief may result in some possible future harm to Empire, in the sense that Empire may, on a permanent as well as a temporary basis, lose a significant business opportunity to acquire control of Pargas.

■ Sections 14(d) and (e) of the Securities Act of 1934, as amended, require full and adequate disclosure in tender offers. One of the disclosure failures by Empire which Pargas asserts is that Empire inadequately disclosed in its May 7, 1976 tender offer the intentions of Empire with respect to the latter's proposed deployment of Pargas' assets. In that regard, Pargas points to certain *pro forma* statements prepared by Empire in connection with the latter's efforts to obtain financing for the tender offer. Pargas contends that those statements demonstrate Empire's intent to turn certain of Pargas' assets into cash by disposing of some of the same, by reducing Pargas' inventories, and by making loans from Pargas to Empire. (Tr. of 5/12/76 at 62–76; 92–94). Empire dismisses those *pro forma* statements as recording "possibilities" not seriously considered by Empire (Tr. of 5/12/76 at 122–55, 164–67). However, in the preliminary posture of this case, this Court cannot assign to those *pro forma* documents the insignificance attributed to them by defendant. On the contrary, this Court is satisfied that plaintiff has established a substantial danger that an unrestricted takeover of Pargas by Empire would result in the "milking" and "upstreaming" activities adverted to at length by counsel for plaintiff. (*See* Plaintiff's Exhibit 2, tabs 2, 3, 4, 5, 12, 14 and the affidavit of Michael Lowry). Further, once this Court has concluded that plaintiffs have shouldered the burden of demonstrating the probable right to relief, *West Virginia Highlands* teaches that this Court must also consider the public interest in determining whether and what type of preliminary injunctive relief is appropriate. Herein, the consequences of alleged violations of both the securities and antitrust laws and the existence of the Regulations issues also require, in the public interest, the grant of plaintiff's request for preliminary injunctive relief. *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 693 (2d Cir. 1973).

**210**

*Disclosure Under the Williams Act of 1968*[9]

The Williams Act of 1968 reflects the view of the Congress that corporate takeovers by way of tender offers are sometimes consistent and sometimes not consistent with the public interest and that they should only be proscribed for good and appropriate reasons. The Williams Act also discloses a clear congressional determination that full and fair disclosure is required in connection with every tender offer. The Williams Act establishes two types of information which must be disclosed—(1) specific items of information required by the Act and Rules promulgated thereunder, and (2) all other material information. Section 13(d) and the SEC Rules promulgated under it require the filing of specified information by any person who acquires more than 5% of a company's stock. Section 14(d) and the SEC Rules promulgated thereunder require that a person making a tender offer for more than 5% of a corporation's stock also file and disclose similar information. Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

In *Sonesta International Hotel Corp. v. Wellington Associates*, 483 F.2d 247, 251 (2d Cir. 1973), Judge Mansfield has written:

The probability of success on the merits in any application for injunctive relief turns greatly upon whether the plaintiff has shown that the tender offer under attack has misstated or omitted *material* facts. The materiality of facts allegedly misstated or omitted depends, in turn, upon whether a reasonable investor might have considered them to be important in deciding whether to accept the tender offer. This standard was set forth by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), where the Court, in finding that the withholding of a material fact established the requisite element of causation in fact, expressed itself as being concerned with materiality "in the sense that a reasonable investor might have considered [the misstated or undisclosed facts] important in the making of this decision [whether to sell shares]." See *Butler Aviation International, Inc. v. Comprehensive Designers, Inc.,* 425 F.2d 842, 845 (2d Cir. 1970) ("inaccurate statements . . . which may have had some tendency to affect the decision of Butler stockholders with respect to the exchange offer").[3]

[3] The test of materiality has elsewhere been stated in terms of whether the decision of a reasonable investor "would" have been affected had the true circumstances been properly disclosed, rather than whether it "might" have been so affected. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 363 (2d Cir. 1973); *Gulf & Western, supra,* 476 F.2d at 696; and especially *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1301–1303 (2d Cir. 1973). Whatever difference that phraseology may make, we are satisfied that the omissions in Wellington's offer would be materially misleading under either of the standards expressed above and under the Supreme Court's understanding of the definition of materiality applied by it in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); and *Affiliated Ute Citizens v. United States, supra.*

To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may

---
**9.** The Williams Act amended the Securities Exchange Act of 1934 so as to add disclosure provisions referred to in this opinion.

refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. *Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., supra,* 476 F.2d at 697; *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298 (2d Cir. 1973). A reasonable stockholder, once informed of the contingency, can then determine whether to assume the risk of its occurrence or non-occurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision.

Pargas alleges that Empire's tender offer fails to meet Williams Act disclosure requirements, for many reasons, including the following: (1) the number of shares of Pargas, which under a combination of Maryland statutory law and Pargas' corporate charter, must vote affirmatively in order to effect a merger of Pargas with another corporation is not accurately stated; (2) Empire's own financial condition is not sufficiently analyzed and set forth; (3) Empire's intention to utilize the assets and/or income of Pargas for the purpose of servicing the debt incurred by Empire in financing Empire's tender offer is not sufficiently revealed; (4) Empire's intention to effectuate a merger between Empire and Pargas is not appropriately stressed; (5) the extent of the antitrust obstacles which may preclude Empire from successfully acquiring control of Pargas are not spelled out; (6) the importance of the appeal pending on May 7, 1976 and taken by the Government from Judge Oliver's decision in *United States v. Empire Gas Corp.,* 393 F.Supp. 903 (W.D.Mo.1975), since affirmed by the Eighth Circuit on May 28, 1976, is underplayed; (7) the fact that the financing Empire obtained for its tender offer was in violation of one or more Federal Reserve Board regulations and related laws and regulations, with the result that new financing of the tender offer may need to be obtained by Empire, is not revealed.

Subsequent to the institution of the within lawsuit, Empire at first seemingly conceded that, with regard to item (1) *supra,* certain of the statements in the tender offer do not adequately take into consideration the Seventh Article of Pargas' corporate charter which together with Maryland law seems to permit a merger with a majority as opposed to a two-thirds vote of stock voting in favor of merger. Under Maryland law, but for that charter provision, a two-thirds vote would be required. *See* Md.Corp. & Ass'n Code Ann., § 2–104(b)(4), (5) (1975). Accordingly, it would appear that Empire's May 7, 1976 tender offer, which states that a two-thirds vote is required for a merger of Pargas with any other corporation, overstates the number of Pargas shareholders whose votes are necessary to consummate a merger and understates the number of such shareholders whose votes could block the same. In an attempt to cure that defect Empire has published an amended tender offer adopting the construction placed upon Pargas' own charter by Pargas' own counsel. Subsequently, however, counsel for Empire has stated that the statements in the initial tender offer with regard to merger may not have been erroneous and that the construction placed upon Pargas' charter by Pargas' own counsel is not entirely free from doubt because of certain allegedly ambiguous language in Pargas' charter and bylaws (Tr. of 5/12/76 at 107–10, 113–14). Empire on May 26, 1976 submitted to this Court and to counsel for Pargas a proposed amended tender offer. That document does not disclose the doubts which Empire's counsel has expressed. However, Empire's counsel has stated Empire's willingness to disclose whatever this Court requires with regard to the "merger percentage" problem.

In addition, while continuing to assert the adequacy of the disclosures in its May 7, 1976 tender offer as amended by its subsequent publication with regard to the merger matter, Empire's counsel has stated that Empire is willing to file an amended tender

offer in which it will make all additional disclosures reasonably required by this Court, and indeed, as related *supra,* submitted the same on May 26, 1976.

In the light of defense counsel's desires to appeal as soon as possible from this Court's June 2, 1976 Order, the complexity of many of the issues herein, and the shortness of time, counsel on both sides have asked that this Court defer, for the present, consideration of the specific language of the amended tender offer. This Court has acceded to that request. Accordingly, this Court will not at this juncture further examine the numerous disclosure questions posed herein. However, this Court will keep in mind when it deals with those disclosure matters the following remarks of the District Court in *Missouri Portland Cement Co. v. Cargill, Inc.,* 375 F.Supp. 249, 268 (S.D.N.Y.), aff'd in part, rev'd in part, 498 F.2d 851 (2d Cir.), cert. denied, 419 U.S. 833, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974):

> As with each of the securities law claims, what this Court requires under the Williams Act concerning financial statements should be regarded as the very minimum standard for disclosure. It is hoped that the Williams Act, as well as the other disclosure and anti-fraud provisions of the Securities Exchange Act of 1934, would cause corporations to act, not as close as possible to the fine line between adequate disclosure and omission, or between a questionable statement and misrepresentation, but rather to give full and clear statements to shareholders at all times.

However, this Court also has kept and will keep well in mind Judge Friendly's warning in *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969), that courts must not be blind to the possibility that "there will no more be a perfect tender offer than a perfect trial", and that imposition of unrealistic standards in connection with tender offers provide to incumbent management of a target corporation such as Pargas "a potent tool" "to protect its own interests against the desires

and welfare of the stockholders." Judge Friendly, also stressed, however, (at 948) the need to assure "basic honesty and fair dealing" in connection with tender offers.

While alleging as grounds for the grant of permanent injunctive relief and the award of damages that defendants have violated both section 7 of the Clayton Act and section 2 of the Sherman Act, Pargas has sought preliminary injunctive relief solely on the basis of alleged violations of section 7 of the Clayton Act. That latter section provides, in pertinent part:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

In *Phillips v. Crown Central Petroleum Corp.,* 376 F.Supp. 1250, 1253–54 (D.Md. 1973), a case also involving antitrust issues, Judge Harvey of this Court commented that the fact-finding process involved in a preliminary relief setting often amounts to a "battle of affidavits", and that when the parties have joined in such a battle, they have consented to a decision based upon the same. In this case, as in *Crown Central,* urgent time pressures have brought about a battle of affidavits, depositions and other documents. Also, as in *Crown Central,* although there exists some conflict within the mountain of such documents, and although the ultimate resolution of such conflicts may need to await trial, there exists in this case at this time a large number of highly relevant and material facts as to which there is little or no dispute. Those facts provide a sufficient basis upon which this Court may fairly reach a decision with regard to the issuance of preliminary relief for antitrust reasons and because of the existence of the Regulations issues.

*Findings of Facts*

1. Empire Gas Corporation ("Empire") is a Missouri corporation with its principal place of business at South Highway 5, Box 303, Lebanon, Missouri 65536. Empire's common shares are listed for trading on the New York Stock Exchange. Empire, through and in conjunction with its wholly-owned subsidiaries, is primarily engaged in the retail and wholesale distribution, transportation, purchase and sale of LP-gas and related products.

2. Pargas, Inc. ("Pargas") is a publicly held corporation organized and existing under the laws of the State of Maryland, with its principal office in Waldorf, Maryland. Pargas is engaged either directly or through wholly-owned subsidiaries in the retail and wholesale distribution, transportation, purchase and sale of LP-gas and related products and in the mining and sale of coal. Its stock is listed for trading on the New York Stock Exchange.

3. On May 7, 1976, Empire made a tender offer for the purchase of a minimum of 850,000 shares (approximately 25.5%) up to a maximum of 2,000,000 shares (approximately 60%) of Pargas common stock for cash at $18.50 net per share (hereinafter referred to as the "offer"). One purpose of the offer is to give Empire voting control of Pargas and to allow it to obtain representation on the Pargas board. [Empire Tender offer published in New York Times, May 7, 1976, para. 10, attached to Affidavit of William C. Hill, Ex. 1, Memorandum In Support Of Motion Of Pargas, Inc. For A Temporary Restraining Order Or A Preliminary Injunction (hereinafter "Pargas Memorandum I")].

4. For its fiscal year ending June 1975, Empire had net sales of $72.02 million—approximately 92% of which were sales of LP-gas, with the balance representing sales of LP-gas appliances and storage equipment. Empire's assets in fiscal 1975 were $62.3 million and its net income after taxes was $5.5 million. During the same period, Empire sold approximately 183,977,518 gallons of LP-gas. Empire currently operates LP-gas bulk plants and sales facilities in some 34 states including Missouri, Arkansas, Louisiana, Mississippi, Tennessee, Alabama, Georgia, Florida, Iowa, Oklahoma, Illinois, Indiana, Ohio, Wisconsin, Minnesota, Nebraska, Kansas, Wyoming, Colorado, Washington, Oregon, California, Alaska, Kentucky, Michigan, Montana, Texas, Idaho, South Dakota, Virginia, West Virginia, South Carolina, North Carolina and Maryland. Empire's business is conducted through 300 wholly-owned subsidiaries and 18 service support subsidiaries, operating some 375 bulk storage plants and employing over 1,200 people. By 1973, Empire ranked fourth in sales among the largest independent distribution companies engaged primarily in the sale of LP-gas at retail. [Annual Report of Empire Gas Company 1973 at 3, Ex. 20, Pargas Memorandum I; Empire 1975 Form 10K, Ex. 11, Pargas Memorandum I; Bacon, Whipple & Company Analysis at 1, Ex. 19, Deposition of William I. Thompson, May 24, 1976 (hereinafter "Thompson Dep."); Affidavit of David Ray Kamerschen, (hereinafter "Kamerschen Aff.") Ex. 31, Pargas Memorandum I; Affidavit of Daryl Floyd McClendon at 3, (hereinafter "McClendon Aff.") Ex. 21, Pargas Memorandum I; Ex. 33, Deposition of Robert W. Plaster, May 8, 1976 (hereinafter "Plaster Dep.").]

5. In 1975, Pargas had LP-gas sales revenues of approximately $100 million, employed approximately 2,000 people and operated some 329 bulk storage plants. During the same period, Pargas sold approximately 248,638,625 gallons of LP-gas. Pargas currently operates LP-gas bulk plants and storage facilities in 22 states including New York, Pennsylvania, New Jersey, Maryland, West Virginia, Virginia, Kentucky, North Carolina, South Carolina, Tennessee, Georgia, Florida, Alabama, Mississippi, Louisiana, Texas, Illinois, Minnesota, Washington, Oregon, Nevada and California. Pargas ranks third in sales among the largest independent distribution companies engaged primarily in the sale of LP-gas at retail [McClendon Aff., *supra,* at 3; Bacon, Whipple & Company Analysis at 1, Ex. 19, Thompson Dep.]

6. LP-gas includes various gases of the methane series which have been compressed into a liquid state, principal examples of which are propane and butane or a mixture thereof. These gases are by-products of the refining of crude oil and the processing of natural gas. From the refining or processing location, the product is transported by pipeline, truck and/or rail to bulk storage facilities where it is subsequently distributed further in trucks by route salesmen to retail customers and dealers. LP-gas is sold for a variety of residential, commercial, industrial and agricultural uses. LP-gas is principally sold to residential users in areas not served by natural gas mains. [Empire Gas Corporation Annual Report 1975, Ex. 1, Deposition of Martin F. Dryden, May 8, 1976 (hereinafter "Dryden Dep."); Suburban Propane Gas Corporation, 1975 Form 10K, Ex. 11, p. 4, Empire Gas Corp.'s Brief in Opposition to Motion of Pargas, Inc. for a Temporary Restraining Order or a Preliminary Injunction (hereinafter "Empire Memorandum I"); Dryden Dep., *supra* at 32; 65–66; Bacon, Whipple & Co. Analysis, *supra*.]

7. LP-gas products possess distinct characteristics and uses in comparison with other energy sources. Unlike natural gas and other fuels, LP-gas is stored and transported under pressure and in liquid form. Its physical and chemical characteristics differ from those of solid fuels, such as wood and coal, and also from other liquid fuel, such as fuel oil, which are not stored and transported under pressure. LP-gas is chemically and physically distinct from other gaseous fuels. LP-gas is most often distributed by delivery truck to end users. Numerous consumers of propane are unable to use alternate energy sources. The clean-burning characteristics, easy portability and safety features of LP-gas further distinguish it from other fuels. [Dryden Dep., *supra* at 29–42; Affidavit of Norbert LeRoy Langley (hereinafter "Langley Aff."), at 3, Ex. 24, Pargas Memorandum I Supplemental Affidavit of Norbert LeRoy Langley (hereinafter "Langley Supp. Aff.") at 2–3, attached to Plaintiff's Reply Brief (herein-

after "Pargas Memorandum II"); Kamerschen Aff., *supra* at 6.]

8. LP-gas is widely recognized within the petroleum industry, and by the public, as a distinct product. Thus, there is a national association of LP-gas industry members, the National LP-Gas Association, and a variety of state LP-gas associations and multi-state associations. The DEL–MAR–VA LP-Gas Association (Delaware-Maryland-Virginia) is an example of such a regional association. Additionally, there are a number of industry publications which are concerned exclusively with the purchase, transportation, distribution and sale of LP-gas. Industry recognition of LP-gas is also demonstrated by the fact that a number of major producers, themselves involved in the production of a variety of petroleum products, have designated separate departments, divisions and executive personnel exclusively relating to LP-gas. The federal government also recognizes LP-gas as a special product category. For example, the Bureau of Mines produces on a regular basis a compilation of LP-gas sales statistics; and, the Federal Energy Administration has promulgated special LP-gas regulations. [Dryden Dep., *supra* at 41–2; Langley Aff., *supra* at 3–4.]

9. LP-gas is characterized by prices different from those of other energy sources. [Langley Aff., *supra* at 3.]

10. LP-gas distribution requires unique facilities, and these facilities are possessed by specialized vendors. Ordinarily, LP-gas distributors do not sell other fuels. LP-gas customers are distinct in that they are often located in rural areas without access to natural gas pipelines; such customers frequently have appliances and fixtures which are not readily convertible to use of other fuels. [Dryden Dep., *supra* at 32, 41–2, 139–40; Langley Aff., *supra* at 3; Langley Supp. Aff., *supra*.]

11. Although LP-gas is a distinct product, it does compete in many areas and in many uses with other sources of energy, particularly fuel oil and electricity. [Pargas, Inc. 1975 Form 10–K filed with the Securities and Exchange Commission on

March 18, 1976, Ex. 9, p. 3, Empire's Brief in Opposition to Motion of Pargas, Inc. for a Temporary Restraining Order or a Preliminary Injunction (hereinafter "Empire Memorandum I"); Petrolane Incorporated 1975 Form 10-K, Ex. 10, p. 11, Empire Memorandum I; Suburban Propane Gas Corporation 1975 Form 10-K, Ex. 11, p. 6, Empire Memorandum I; Pargas Advertising Literature, Ex. 8, Empire Memorandum I; Deposition of Martin Dryden, Jr., Empire Vice President, May 8, 1976, pp. 30-38 (hereinafter "Dryden Dep.").]

12. Transportation costs ordinarily limit the sales of LP-gas distributors to roughly 20-35 miles of their bulk distribution plants. In some geographic areas where population is sparse, the sales area can be as large as 60 to 150 miles from the bulk distribution plant. By reason of the location of his residence or place of business, a consumer is to some extent likewise limited in his ability to purchase LP-gas from alternative suppliers. [Langley Aff., *supra* at 4; Dryden Dep., *supra* at 43-45, 69-70; Kamerschen Aff., *supra* at 6; Dryden Dep., p. 70; Affidavit of Robert Lee Boggs (hereinafter "Boggs Aff."), Ex. 28, par. 4, Memorandum In Support of Motion of Pargas, Inc. for a Temporary Restraining Order or a Preliminary Injunction (hereinafter "Pargas Memorandum I").]

13. There is a trend toward increased concentration in the LP-gas industry nationally. Additionally, localized marketing areas in which LP-gas is distributed are characterized by high concentration. [Bacon, Whipple & Company Analysis, *supra*, at 2; Kamerschen Aff., *supra*, at 8; Langley Aff., *supra* at 4; Affidavit of Charles Philip German (hereinafter "German Aff.") Exhibit 23, Pargas Memorandum I; Affidavit of Donald Cecil Long, (hereinafter "Long Aff.") Exhibit 25, Pargas Memorandum I; Affidavit of Harley Victor Boswell, (hereinafter "Boswell Aff.") Exhibit 26, Pargas Memorandum I; Affidavit of Kenneth R. Dunn, (hereinafter "Dunn Aff.") Exhibit 27, Pargas Memorandum I; Affidavit of Robert Lee Boggs, (hereinafter "Boggs Aff.") Exhibit 28, Pargas Memoran-

dum I; Affidavit of E. W. Throndson, (hereinafter "Throndson Aff.") Exhibit 29, Pargas Memorandum I; Affidavit of J. Howard Wheatley, (hereinafter "Wheatley Aff.") Exhibit 30, Pargas Memorandum I.]

14. There have been numerous acquisitions in the LP-gas industry over the past several years by many of the largest competitors in the industry. Since 1963, Empire has made over 87 separate acquisitions. These have included such chain acquisitions as those consummated with Unigas, Super Propane, Gas & Chemicals and Phillips. Pargas has made over 107 acquisitions since September 16, 1966. Petrolane, Incorporated, the first ranking independent LP-gas distributor, has made a number of acquisitions of LP-gas companies in the northeastern United States, Indiana, Tennessee and Missouri. In 1971, Suburban Propane Gas Corporation, the second ranking independent distributor, acquired another significant LP-gas marketer, Vangas, Inc. In an apparent change of policy, major petroleum producers now, however, refrain from acquisitions in the retail LP-gas distribution market. [Empire 1975 Form 10K, *supra;* Petrolane, Incorporated 1975 Form 10K, Exhibit 10, Empire Memorandum I; Suburban Propane Gas Corporation, 1975 Form 10K, Exhibit 11, Empire Memorandum I; Thompson Dep., *supra,* at 139-40; Plaster Dep. at 81, 82, 110 and 111.]

15. Plaintiffs have raised serious questions as to whether barriers to successful entry into LP-gas distribution, particularly on a multi-state basis, are substantial. In LP-gas markets, long-standing customer and dealer ties with established competitors provide advantages for existing firms. Attracting customers and dealers and building customer and dealer loyalty require of any new entrant into a given market more time and capital than is necessary in markets where customer and dealer ties are less significant. Entry into the LP-gas industry generally requires a storage tank of between 1,000 and 30,000 gallon capacity, a supply of LP-gas, a truck, and certain consumer tanks. A typical 18,000 gallon storage tank requires an investment of about

$15,000. Empire in October, 1975 acquired an ongoing LP-gas operation in Hancock, Maryland at a purchase price of approximately $175,000. [Deposition of Darrell Deputy, Jr., May 10, 1976 (hereinafter "Deputy Dep.") at 97; Dryden Dep. at 42–45, 91; *see United States v. Empire Gas Corp.,* 537 F.2d 296 (8th Cir. 1976).]

16. In LP-gas markets, the relatively high cost of product transportation places some competitive premium on having ready access to sources of supply. Competitors with large storage facilities appear to possess some competitive advantage over smaller competitors without such facilities, particularly in periods of short supply. [Deputy Dep., *supra,* at 86–97; Dryden Dep., *supra,* at 130; Deposition of Earl Noe, May 10, 1976 (hereinafter "Noe Dep.") at 20–28.]

17. Successful entry into a market is facilitated by marketing experience and know-how. [Langley Aff., *supra* at 2; Dryden Dep., *supra* at 91.]

18. In the past five years there appear to have been few new entrants into the LP-gas business. [Langley Aff., *supra* at 2.]

19. In the past five years, new competition in local markets has seemingly been provided almost wholly by existing LP-gas companies extending their service areas by building or acquiring facilities. [Langley Aff., *supra* at 2.]

20. Empire and Pargas are direct competitors in the sale of LP-gas in at least eleven local markets. These include: Hancock (Maryland) District; Foley (Alabama) District; Placerville (California) District; Lafayette (Louisiana) District; Eunice (Louisiana) District; Columbus (Mississippi) District; Owensboro (Kentucky) District; Wilson (North Carolina) District; Robersonville (North Carolina) District; Oneonta (Alabama) District; Huntsville (Alabama) District. [German Aff., *supra;* Boswell Aff., *supra;* Dunn Aff., *supra;* Boggs Aff., *supra;* Wheatley Aff., *supra.*]

21. Eleven of the local district markets in which Empire and Pargas directly com-

pete were analyzed in detail and reflect the following:

## A. HANCOCK (MARYLAND) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Hancock (Maryland) District during 1975 was approximately 1,134,179 gallons. Pargas sold approximately 484,179 gallons, which accounted for 42.7% of this local market. Empire sold approximately 650,000 gallons, which accounted for 57.3% of this market. A third company, Dawson Hardware, made retail sales of 325,000 gallons during this period, but Dawson purchased its entire supply from Empire on a wholesale basis. Thus, since all of Dawson's sales were merely resales of purchases from Empire, the Hancock District is concentrated to the point that two firms account for 100% of the local market.

If Empire were to acquire Pargas, Empire's sales would account for 100% of the LP-gas market in the Hancock District. This acquisition, therefore, might provide Empire with what appears at this preliminary stage to be a virtual monopoly in the marketing area.

### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE | 650,000 | 57.3 |
| PARGAS | 484,179 | 42.7 |

### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 1,134,179 | 100 |

The above figures, it is noted, exclude certain sales provided in the Hancock region by the Shawley Gas Co. of Hagerstown, Md. (28 miles east of Hancock), of the Pyrofax, Smith, and Kendall Gas Companies located in McConnellsburg, Pa. (25 miles north of Hancock), and of Thompson's of Boonsboro, Md. (also within 20–30 miles of Hancock). [German Aff., *supra;* Aff. of Charles McCarty, Ex. A to Defendant's Ex. 6.]

## B. FOLEY (ALABAMA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Foley (Alabama) District during 1975 was approximately 2,958,213 gallons. Pargas sold 558,-213 gallons, which accounted for 18.9% of this local market. Empire sold approximately 400,000 gallons, which accounted for 13.5% of this market.

If Empire were to acquire Pargas, Empire's sales would account for 32.4% of the market. Moreover, this acquisition would reduce the number of competitors in the Foley District, more than double Empire's present market share, and further concentrate this market to the point where the two top competitors would control more than 66% of the entire market and the top four firms will account for 100% of the market.

### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| Blossman Gas | 1,000,000 | 33.8 |
| National Butane | 600,000 | 20.0 |
| PARGAS | 558,213 | 18.9 |
| EMPIRE | 400,000 | 13.5 |
| Corporal Gas | 400,000 | 13.5 |

### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| Blossman Gas | 1,000,000 | 33.8 |
| EMPIRE – PARGAS | 958,213 | 32.4 |
| National Butane | 600,000 | 20.0 |
| Corporate Gas | 400,000 | 13.5 |

[Boswell Aff., *supra.*]

## C. PLACERVILLE (CALIFORNIA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Placerville (California) District during 1975 was approximately 6,047,983 gallons. Pargas sold approximately 1,847,983 gallons, which accounted for 30.1% of this local market. Empire sold approximately 900,000 gallons, which accounted for 14.9% of this market. The Placerville District is presently so heavily concentrated that the top four firms in terms of sales volume account for 90.1% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 45.4% of the market.

### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| PARGAS | 1,847,983 | 30.1 |
| Vangas | 1,700,000 | 28.1 |
| Petrolane | 1,000,000 | 16.5 |
| EMPIRE | 900,000 | 14.9 |
| Calgas | 500,000 | 8.3 |
| American River | 100,000 | 1.7 |

### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 2,747,983 | 45.4 |
| Vangas | 1,700,000 | 28.1 |
| Petrolane | 1,000,000 | 16.5 |
| Calgas | 500,000 | 8.3 |
| American River | 100,000 | 1.7 |

Therefore, if Empire acquires Pargas, Empire will seemingly become the dominant marketer of LP-gas in the Placerville District, and the top four firms in terms of sales volume in the Placerville District will account for 98.3% of the entire local market.

[Throndson Aff., *supra.*]

## D. LAFAYETTE (LOUISIANA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Lafayette (Louisiana) District during 1975 was approximately 8,077,938 gallons. Pargas sold approximately 727,938 gallons, which accounted for 9% of this local market. Empire sold approximately 1,500,000 gallons, which accounted for 18.6% of this market. The Lafayette District is presently so heavily concentrated that the top four firms in terms of sales volume account for 71.2% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 27.6% of the market. Indeed, if the LP-gas sales of American Oil Co., a major producer with refining capability, and not an independent LP-gas distributor, are excluded from this market otherwise comprised of independent

LP-gas distributors, Empire's after-acquisition share of the Lafayette District would be 36.7%.

### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| American Oil Co. | 2,000,000 | 24.8 |
| EMPIRE | 1,500,000 | 18.6 |
| Durham Gas | 1,500,000 | 18.6 |
| Petrolane | 750,000 | 9.3 |
| PARGAS | 727,938 | 9.0 |
| LaSalle Gas | 450,000 | 5.6 |
| Allied Gas | 450,000 | 5.6 |
| Reed Gas | 450,000 | 5.6 |
| Daigle Gas | 250,000 | 3.1 |

### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 2,227,938 | 27.6 |
| American Oil Co. | 2,000,000 | 24.8 |
| Durham Gas | 1,500,000 | 18.6 |
| Petrolane | 750,000 | 9.3 |
| LaSalle Gas | 450,000 | 5.6 |
| Allied Gas | 450,000 | 5.6 |
| Reed Gas | 450,000 | 5.6 |
| Daigle Gas | 250,000 | 3.1 |

Therefore, if Empire acquires Pargas, Empire will seemingly become the dominant marketer of LP-gas in the Lafayette District, and the top four firms in terms of sales volume in the Lafayette District will account for 80.2% of the entire local market.

[Wheatley Aff., *supra.*]

### E. EUNICE (LOUISIANA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Eunice (Louisiana) District during 1975 was approximately 9,415,063 gallons. Pargas sold approximately 1,015,063 gallons, which accounted for 10.8% of this local market. Empire sold approximately 1,500,000 gallons, which accounted for 15.9% of this market. The Eunice District is presently so heavily concentrated that the top four firms in terms of sales volume account for 69.2% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 26.7% of the market. If the LP-gas sales of American Oil Co., a major producer with refining capability, and not an independent LP-gas distributor, are excluded from this market otherwise comprised of independent LP-gas distributors, Empire's after-acquisition share of the Eunice District market would be 39.2%.

### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| American Oil Co. | 3,000,000 | 31.9 |
| EMPIRE | 1,500,000 | 15.9 |
| PARGAS | 1,015,063 | 10.8 |
| Reed Gas | 1,000,000 | 10.6 |
| Gas Appliance Co. | 1,000,000 | 10.6 |
| Petrolane | 750,000 | 8.0 |
| Daigle Gas | 600,000 | 6.4 |
| Farmers Gas | 500,000 | 5.3 |
| Lake Arthur Butane | 50,000 | .1 |

### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| American Oil Co. | 3,000,000 | 31.9 |
| EMPIRE – PARGAS | 2,515,063 | 26.7 |
| Reed Gas | 1,000,000 | 10.6 |
| Gas Appliance Co. | 1,000,000 | 10.6 |
| Petrolane | 750,000 | 8.0 |
| Daigle Gas | 600,000 | 6.4 |
| Farmers Gas | 500,000 | 5.3 |
| Lake Arthur Butane | 50,000 | .1 |

Therefore, if Empire acquires Pargas, the top four firms in terms of sales volume in the Eunice District will account for 69.2% of the entire local market.

[Wheatley Aff., *supra.*]

### F. COLUMBUS (MISSISSIPPI) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Columbus (Mississippi) District during 1975 was approximately 4,768,937 gallons. Pargas sold approximately 893,937 gallons, which accounted for 18.7% of this local market. Empire sold approximately 625,000 gallons, which accounted for 13.1% of this market. The Columbus District is presently so heavily concentrated that the top firms in terms of sales volume account for 86.9% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 31.8% of the market.

tors, Empire's after-acquisition share of the Owensboro District market would be 50.9%.

#### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| Dowdlee Butane | 1,500,000 | 31.5 |
| Columbus Butane | 1,000,000 | 21.0 |
| PARGAS | 893,937 | 18.7 |
| United Gas | 750,000 | 15.7 |
| EMPIRE | 625,000 | 13.1 |

#### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 1,518,937 | 31.8 |
| Dowdlee Butane | 1,500,000 | 31.5 |
| Columbus Butane | 1,000,000 | 21.0 |
| United Gas | 750,000 | 15.7 |

#### 1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| PARGAS | 1,357,387 | 26.7 |
| Sure Gas | 1,100,000 | 21.7 |
| Miles LP Gas | 1,000,000 | 19.7 |
| EMPIRE | 820,000 | 16.2 |
| Texaco | 800,000 | 15.8 |

#### AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 2,177,387 | 42.9 |
| Sure Gas | 1,100,000 | 21.7 |
| Miles LP Gas | 1,000,000 | 19.7 |
| Texaco | 800,000 | 15.8 |

Therefore, if Empire acquires Pargas, Empire will seemingly become the dominant marketer of LP-gas in the Columbus District, and the top four firms in terms of sales volume in the Columbus District will account for 100% of the local market.

[Wheatley Aff., *supra*.]

#### G. OWENSBORO (KENTUCKY) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Owensboro (Kentucky) District during 1975 was approximately 5,077,387 gallons. Pargas sold approximately 1,357,387 gallons, which accounted for 26.7% of the local market. Empire sold approximately 820,000 gallons, which accounted for 16.2% of this market. The Owensboro District is presently so heavily concentrated that the top four firms in terms of sales volume account for 84.2% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 42.9% of the market. If the LP-gas sales of Texaco, a major producer with refining capability, and not an independent LP-gas distributor, are excluded from this market otherwise comprised of independent LP-gas distribu-

Therefore, if Empire acquires Pargas, Empire will seemingly become the dominant marketer of LP-gas in the Owensboro District, and the top four firms in terms of sales volume in the Owensboro District will account for 100% of the local market. The above analysis does not include the name of Pyrofax Gas, which is listed in the Yellow Pages of the Owensboro Telephone Directory under "Liquefied Petroleum Gas". [Wheatley Aff., *supra*; Leivan Affidavit at 7 and Ex. D thereto.]

#### H. WILSON (NORTH CAROLINA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Wilson (North Carolina) District during 1975 was approximately 6,201,325 gallons. Pargas sold approximately 951,325 gallons, which accounted for 15.3% of this local market. Empire sold approximately 1,200,000 gallons, which accounted for 19.4% of this market. The Wilson District is presently so heavily concentrated that the top four firms in terms of sales volume account for 87.1% of the entire market.

If Empire were to acquire Pargas, Empire's sales would account for 34.7% of the market.

220

1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| Suburban Propane | 1,750,000 | 28.2 |
| Deans Gas | 1,500,000 | 24.2 |
| EMPIRE | 1,200,000 | 19.4 |
| PARGAS | 951,325 | 15.3 |
| R. E. Deans | 800,000 | 12.9 |

AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 2,151,325 | 34.7 |
| Suburban Propane | 1,750,000 | 28.2 |
| Deans Gas | 1,500,000 | 24.2 |
| R. E. Deans | 800,000 | 12.9 |

Therefore, if Empire acquires Pargas, Empire apparently would become the dominant marketer of LP-gas in the Wilson District, and the top four firms in terms of sales volume in the Wilson District will account for 100% of the local market. The above statistics exclude competition which may be provided by certain LP-gas dealers in Rocky Mount, North Carolina whose combined 1975 sales total 2,800,000 gallons. Those dealers may provide some competition in the Wilson, North Carolina region. [Boggs Aff., *supra*; Leivan Aff., *supra* at 5.]

## I. ROBERSONVILLE (NORTH CAROLINA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Robersonville (North Carolina) District during 1975 was approximately 11,559,265 gallons. Pargas sold approximately 1,859,265 gallons which accounted for 16.1% of this local market. Empire sold approximately 1,400,000 gallons, which accounted for 12.1% of this market. At this time, in the Robersonville District, Pargas has the largest market share among the nine competing companies, while Empire ranks approximately fourth.

If Empire were to acquire Pargas, Empire's sales would account for 28.2% of the market.

1975

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| PARGAS | 1,859,265 | 16.1 |
| Swain Gas | 1,800,000 | 15.6 |
| Parson's Gas | 1,500,000 | 13.0 |
| EMPIRE | 1,400,000 | 12.1 |
| Carson & Stokes Gas | 1,400,000 | 12.1 |
| Baker Gas | 1,200,000 | 10.4 |
| Blount Gas | 1,000,000 | 8.6 |
| Harrison Gas | 1,000,000 | 8.6 |
| Miller Gas | 400,000 | 3.5 |

AFTER ACQUISITION

| Competitor | Sales (Gallons) | Percentage of Market |
|---|---|---|
| EMPIRE – PARGAS | 3,259,265 | 28.2 |
| Swain Gas | 1,800,000 | 15.6 |
| Parson's Gas | 1,500,000 | 13.0 |
| Carson & Stokes Gas | 1,400,000 | 12.1 |
| Baker Gas | 1,200,000 | 10.4 |
| Blount Gas | 1,000,000 | 8.6 |
| Harrison Gas | 1,000,000 | 8.6 |

Therefore, if Empire acquires Pargas, Empire will seemingly become the dominant marketer of LP-gas in the Robersonville District, and Empire will possess a degree of power over both purchases and sales of LP-gas in the District not presently held by any company. The area encompassed by the above statistics is, unlike other of the enumerated marketing areas, which encompass a territory of 25–35 miles, a marketing area of approximately 50–60 miles, and includes towns in which Empire operates plants which might be excluded from said statistics if a lesser marketing area were considered. The plants of Pargas and Empire in the Robersonville marketing area are separated by approximately 23 miles. The terrain in the Robersonville marketing area is similar to that of the Rocky Mount marketing area. [Boggs Aff., *supra;* Leivan Aff., *supra* at 5–6.]

## J. ONEONTA (ALABAMA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Oneonta (Alabama) District during 1975 was approximately 5,687,731 gallons. Pargas sold approximately 1,202,731 gallons, which accounted for 21.1% of this local market. The sales figures for Pargas and its competitors, other than Empire, in the Oneonta District are as follows:

| Competitor | 1975 Sales (Gallons) |
|---|---|
| PARGAS | 1,202,731 |
| American Oil | 1,200,000 |
| Petrolane | 1,000,000 |
| Allgas | 300,000 |
| Misc. | 300,000 |

In addition, Empire had sales of 1,059,171 gallons from its Oneonta office in 1975, including some 433,000 gallons delivered to satellite bulk storage plants in towns located 14–30 miles from Oneonta, a significant percentage of which should be excluded from the 1,059,171 figure. Empire's market share in the Oneonta region, though not inconsiderable, is thus not readily determinable. Nor for that matter is the after-acquisition combined share of Empire and Pargas. [Dunn Aff., *supra;* Leivan Aff., *supra* at 6.]

## K. HUNTSVILLE (ALABAMA) DISTRICT

The total volume of LP-gas sold by Pargas and its competitors in the Huntsville (Alabama) District during 1975 was approximately ·8,918,671 gallons. Pargas sold 1,396,577 gallons, which accounted for 15.7% of this local market. The Huntsville sales figures for Pargas and its competitors, excluding Empire but including the Sun Oil Co., a major producer with refining capability and not an independent LP-gas distributor, are as follows:

| Competitor | 1975 Sales (Gallons) |
|---|---|
| Sun Oil | 2,000,000 |
| PARGAS | 1,396,577 |
| Ardmore Gas | 881,356 |
| Thermogas | 733,968 |
| Sisco Gas | 659,695 |
| Misc. | 150,000 |

Empire's company records indicate that Empire's 1975 sales out of Huntsville, including some 390,000 gallons delivered to a satellite storage plant located some 50 miles away, were 938,460 gallons. Empire's sales in the Huntsville area thus may be as little as 550,000 gallons. It thus appears that Empire's present market share is 8.6%, and that the after-acquisition combined share of Pargas and Empire is 30.6%. [Dunn Aff., *supra;* Leivan Aff., *supra* at 4–5.]

22. The top four firms in each local market in which Pargas competes generally account for over 60% of sales in that market. Pargas has stated in certain documents filed by it with the Securities Exchange Commission on March 19, 1976 that in each of its operating areas Pargas competes with units of at least three regional LP-gas marketers, some of which are larger than Pargas, as well as with numerous local operators, and that Pargas considers the LP-gas distribution business highly competitive. [Langley Aff., *supra,* at 4; Kamerschen Aff., *supra* at 7; Pargas, Inc. 1975 Form 10–K filed with the Securities and Exchange Commission on March 19, 1976, Ex. 9, p. 3, Empire Memorandum I.]

23. Empire has grown steadily through acquisition, acquiring since its inception more than 87 LP-gas distributors. Empire has had and now has an active "acquisitions program" with no specific limits. [Empire 1975 Form 10K, *supra;* Bacon, Whipple Analysis, *supra* at 6; Deputy Dep., *supra* at 68–9, 71, 73, and 75.]

24. Recently, Empire began a *de novo* expansion program into the Northeast. Construction of LP-gas plants is underway in Maine, New Hampshire and Vermont. Empire is planning to enter the Southwest and its first acquisition in that area is or will be in Arizona. Within recent months, Empire acquired LP-gas plants in Jacksonville and Decatur, Illinois. [Dryden Dep., *supra* at 50–1, 113–4; Deputy Dep., *supra* at 70–4; Deposition of Eugene O'Brien, May 9, 1976 (hereinafter "O'Brien Dep.") at 18–20.]

25. Empire has the financial capability and marketing expertise to enter virtually any trade area in the United States. Its objective is to have LP-gas outlets in every state. [Dryden Dep., *supra* at 75, 87; Deputy Dep., *supra* at ·68–75.]

26. Plaintiff has raised serious questions as to whether Empire is a most likely potential entrant into local marketing areas in which it does not presently compete.

[Langley Aff., *supra* at 23; *see* Deputy Dep., *supra* at 68–70.]

27. Plaintiff has raised serious questions as to whether Empire is perceived as a most likely potential entrant into various local marketing areas in which it does not presently compete. [*See* Langley Aff., *supra* at 2–3.]

28. On May 7, 1976, Empire Gas Corporation ("Empire") made a tender offer ("Empire Offer") for a minimum of 850,000 shares (approximately 25.5%) up to a maximum of 2,000,000 shares (approximately 60%) of Pargas, Inc. ("Pargas") common stock at $18.50 per share. The Empire Offer states that if more than 2,000,000 Pargas shares are tendered and not withdrawn, Empire may purchase 2,000,000 shares on a *pro rata* basis, that is, returning a portion of the tendered shares to each tendering stockholder. Thus, under the Empire Offer, up to approximately 40% of Pargas shares may remain in the hands of present Pargas stockholders after the offer is completed. [Paragraph 1 of Empire Offer, Exhibit A to the Complaint and to Hill Affidavit, Plaintiff's Exhibit 1, Tab 1].

29. The Empire Offer states that the money required to purchase the shares under the Offer will be borrowed from Continental Illinois National Bank and Trust Company of Chicago ("Continental") and Mercantile Trust Company, N.A. ("Mercantile") under a $50,000,000 term loan agreement entered into on May 6, 1976. The Offer states that the loan is unsecured. [Paragraph 9 of the Empire Offer].

30. The Empire Offer states that Empire's objective is to purchase 2,000,000 shares, or approximately 60%, of the outstanding Pargas shares, and to obtain control of Pargas. Empire intends to seek at least majority and possibly total representation on the Pargas board of directors if it acquires more than 50% of the outstanding Pargas shares. If Empire acquires control of Pargas, it intends to consider combining Pargas with Empire. [Empire Offer, ¶¶ 9–10 at 9].

31. The common stock of Pargas is listed on the New York Stock Exchange and the Philadelphia Stock Exchange. [Paragraph 5 of the Empire Offer].

### Antitrust

Section 7 of the Clayton Act expressly indicates that that statute proscribes the acquisition by one corporation engaged in commerce of "the whole or any part of the stock" of another corporation engaged in commerce "where in *any line of commerce in any section of the country,* the effect of such acquisition *may be substantially to lessen competition,* or to tend to create a monopoly."

The intent of that section has been summarized by the Supreme Court in *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967):

Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. See *Brown Shoe Co. v. United States,* 370 U.S. 294 [82 S.Ct. 1502, 8 L.Ed.2d 510]; *United States v. Philadelphia National Bank,* 374 U.S. 321 [83 S.Ct. 1715, 10 L.Ed.2d 915]. The section can deal only with probabilities, not with certainties. *Brown Shoe Co. v. United States,* supra, 370 U.S. at 323 [82 S.Ct. 1502 at 1522]; *United States v. Penn-Olin Chemical Co.* 378 U.S. 158 [84 S.Ct. 1710, 12 L.Ed.2d 775]. And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated.

*See also United States v. Aluminum Co.,* 377 U.S. 271, 280, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

■ For reasons enumerated *infra,* plaintiffs have demonstrated a substantial probability of establishing that the effect of a

successful completion of Empire's tender offer "may be" substantially to lessen competition in a "line of commerce" in a "section of the country".

### Product Market

In *United States v. Empire Gas, supra,* a case in which certain practices of Empire were alleged by the Government to constitute violations of section 2 of the Sherman Act, Judge Oliver concluded (at 906, 909) that the Government had not in that case, after several years of litigation, borne the burden of establishing that liquefied petroleum constituted a "product market" for purposes of that statute. Defendants urged this Court to adopt that conclusion of Judge Oliver as conclusive in this litigation.

On May 17, 1976, prior to the Eighth Circuit's filing of its opinion on May 28, 1976 in connection with the appeal from Judge Oliver's decision, this Court held that Judge Oliver's determination of the relevant product market in that case did not foreclose relief to plaintiffs herein, because the standards for determining a relevant product market for purposes of section 2 of the Sherman Act and for purposes of section 7 of the Clayton Act are not identical. In *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 593–94 n.36 (S.D.N. Y.,1958), Judge Weinfeld offered the following pointed commentary as to the difference between those two statutes:

> * * * There is a basic distinction between § 2 of the Sherman Act and § 7 of the Clayton Act. Further, monopoly power was defined by the Supreme Court in the Cellophane case as "the power to control prices or exclude competition". Obviously, when the question is power over price, substitute products may be relevant because they can limit that power. The issue under § 7 of the Clayton Act is not whether a merger may result in a company having power over price or the power to exclude competition. The issue under § 7 is whether there is a reasonable probability of substantial lessening of competition. There can be a substantial lessening of competition with

respect to a product whether or not there are reasonably interchangeable substitutes. The merger of two producers of a product may substantially lessen competition or tend to create a monopoly in the market for that product even though it does not substantially lessen competition or tend to create a monopoly in the broader market embracing all the products which are reasonably interchangeable with that product. But cf. *Matter of Brillo Mfg. Co.,* F.T.C.Do. No. 6557 (May 23, 1958). This does not, however, mean that interchangeability can be ignored—a high degree of interchangeability may under certain circumstances make it more or less the same product. *American Crystal Sugar Co. v. Cuban-American Sugar Co.,* D.C.S.D.N.Y.1957, 152 F.Supp. 387, affirmed, 2 Cir., 1958, 259 F.2d 524.

In *General Foods Corp. v. FTC,* 386 F.2d 936, 940 (3d Cir. 1967), the Court noted:

> Section 7 of the Clayton Act prohibits any merger which may substantially lessen competition or tend toward monopoly "in any line of commerce." Prohibition of a merger depends, not upon the form it assumes, but upon the realities of the market in which the merged companies operate. *Federal Trade Commission v. Procter & Gamble Co.* (hereinafter "Clorox") 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Reynolds Metals Co. v. Federal Trade Commission,* 114 U.S. App.D.C. 2, 309 F.2d 223 (1962). The fact that different products may in some sense be competitive with each other is not sufficient to place them in the same market if by themselves they constitute distinct product lines. *United States v. Aluminum Co. of America (Alcoa-Rome Cable),* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Nor does the availability of substitute products compel the conclusion that they belong in the same relevant market. *United States v. E. I. Du Pont De Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), *Reynolds Metals Co. v. Federal Trade Commission,* supra.

In *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8

L.Ed.2d 510 (1962), the Supreme Court addressed itself to the task of clarifying some of the uncertainty surrounding the concept of relevant market. There, the Court said:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes. *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as *industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors.*" * * * [Emphasis supplied by the Court in *General Foods.*]

See also *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 814–15 (9th Cir. 1961), *cert. denied*, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962); B. Bock, Mergers and Markets, A Guide to Economic Analysis of Case Law 87 (3d ed. 1964); B. Bock, Mergers and Markets, An Economic Analysis of Case Law 27 (1960).

■ Application of the *Brown Shoe* criteria to the facts established in this case leads to the conclusion that Pargas has successfully demonstrated a strong probability of success in establishing at trial that LP-gas constitutes a relevant product market for purposes of section 7 of the Clayton Act. Despite the fact that fuels such as wood,

coal, fuel oil, natural gas and electricity are to some greater or lesser extent functionally interchangeable with LP-gas, there is evidence in this record to indicate that because of the unique characteristics of LP-gas, certain users of the same cannot, without purchase of new apparatus, utilize other forms of energy.

On May 28, 1976, some eleven days after this Court rendered its oral opinion in this case, the Eighth Circuit, in affirming Judge Oliver's decision in the *Empire* case, nonetheless indicated its conclusion that Judge Oliver had "applied an incorrect legal standard in order to determine whether LP-gas sales was a relevant product market or submarket for purposes of section 2 of the Sherman Act", and wrote that "LP retail sales is a relevant product market, or perhaps more accurately a relevant submarket within the energy market within the meaning of section two".[10]

### Geographic Market

■ Plaintiff has alleged in this case that the acquisition of control of Pargas by Empire would have anti-competitive effects in some twenty-three geographical local areas scattered throughout the country, and has supported such allegation with in-depth statistical analyses of the liquefied petroleum market in eleven such areas. Defendants have excepted to certain facts alleged by Pargas and to certain analyses urged by Pargas with regard to the alleged anti-competitive effect in those eleven areas. In making its findings of fact, *supra*, this Court has given to defendants the benefit of each of those exceptions. However, even so, the findings made by this Court, based upon the record in this case to date, disclose that the acquisition of control of Pargas by Empire would, in view of the current division of sales in at least *eight* of those eleven

---

10. A copy of the Eighth Circuit's May 28, 1976 opinion in *Empire* is appended hereto as Appendix D. With regard to product market, *see also United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) (in which the production, transportation,

and sale of natural gas were held to constitute a line of commerce for purposes of § 7); *Kennecott Copper Corp.*, 78 F.T.C. 741 (1971), *aff'd*, 467 F.2d 67 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), in which coal was held to constitute a relevant product market for antitrust purposes.

markets among Pargas, Empire and their competitors, cause the combined current sales of Pargas, Empire, and other competitors in each of those markets to be in excess of the percentage permitted by the presently existing guidelines of the Department of Justice which apply to the top four competitors in each market. 1 CCH Trade Regulation Reporter ¶ 4510.[11]

Defendants have, however, strenuously argued that the geographic markets selected by Pargas lack economic significance and exaggerate the ultimate effect of Empire's tender offer upon competition, and has directed this Court's attention to the 1950 amendments to the Clayton Act which added to said statute the words "in any line of commerce in any section of the country".

In *Brown Shoe*, 370 U.S. 294, 319–20, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), the Supreme Court wrote:

* * * [A]t the same time that it sought to create an effective tool for preventing all mergers having demonstrable anticompetitive effects, Congress recognized the stimulation to competition that might flow from particular mergers. When concern as to the Act's breadth was expressed, supporters of the amendments indicated that it would not impede, for example, a merger between two small companies to enable the combination to compete more effectively with larger corporations dominating the relevant market, nor a merger between a corporation which is financially healthy and a failing one which no longer can be a vital competitive factor in the market.[34] The deletion of the word "community" in the original Act's description of the relevant geographic market is another illustration of Congress' desire to indicate that its concern was with the adverse effects of a given merger on competition only in an economically significant "section" of the country.[35] Taken as a whole, the legisla-

[35] The Federal Trade Commission's amendment, see note 30, supra, included the phrase "where . . . in any section, community, or trade area, there is reasonable probability that the effect of such acquisition may be to

substantially lessen competition." Congressman Kefauver urged deletion of the word "community" on the ground that it might suggest, for example, that a merger between two small filling stations in a section of a city was proscribed. Hearings on H.R. 515, at 260. And see also 96 Cong.Rec. 16453. The fear of literal prohibition of all but *de minimis* mergers through the use of the word "community" was also cited by the Senate Report as the basis for its retention solely of the word "section." S.Rep.No.1775, 81st Cong., 2d Sess. 4. The reference to "trade area" was deleted as redundant, when it became clear that the "section" of the country to which the Act was to apply, referred not to a definite geographic area of the country, but rather the geographic area of effective competition in the relevant line of commerce. See S. Hearings on H.R. 2734, at 38–52, 66–84, 101–102, 132, 133, 144, 145; H.R.Rep.No.1191, 81st Cong., 1st Sess. 8; S.Rep.No.1775, 81st Cong., 2d Sess. 4, 5–6. The Senate Report cited with approval the definition of the market employed by the Court in *Standard Oil Co. of California v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371, 1378.

tive history illuminates congressional concern with the protection of *competition*, not competitors, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition. [Emphasis in the original.] [Footnote 34 omitted.]

Additionally, in *Brown Shoe* (at 336–37, 82 S.Ct. at 1530), the Court stated:

### The Geographic Market.

The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. See S.Rep.No.1775, 81st Cong., 2d Sess. 5–6; *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057, 1066. Moreover, just as a product submarket may have § ʳ significance as the proper "line of con - merce," so may a geographic submarket be considered the appropriate "section of the country." *Erie Sand & Gravel Co. v. Federal Trade Comm.*, 291 F.2d 279, 283 (C.A. 3d Cir.); *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 595–603 (D.C.S.D.N.Y.). Congress prescribed a

11. *See* Appendix E hereto.

pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" [64] of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area. *United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 193–94 (S.D.N.Y.1960); *United States v. Maryland & Virginia Milk Producers Ass'n.,* 167 F.Supp. 799 (D.C.D.C.), aff'd 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880. The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7. That section speaks of "any . . . section of the country," and if anticompetitive effects of a merger are probable in "any" significant market, the merger—at least to that extent—is proscribed.[65] [Emphasis in

[65] To illustrate: If two retailers, one operating primarily in the eastern half of the Nation, and the other operating largely in the West, competed in but two mid-Western cities, the fact that the latter outlets represented but a small share of each company's business would not immunize the merger in those markets in which competition might be adversely affected. On the other hand, that fact would, of course, be properly considered in determining the equitable relief to be decreed. Cf. *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (D.C.E.D.Pa.), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806.

original.] [Footnote 64 omitted.]

In *United States v. Phillipsburg National Bank,* 399 U.S. 350, 358, 362–65, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970), the Supreme Court wrote (at 365, 90 S.Ct. at 2044):

Appellee banks argue that Phillipsburg-Easton "cannot conceivably be considered a 'market' for antitrust purposes," on the ground that it is not an "economically significant section of the country." They cite our language in *Brown Shoe,* supra, 370 U.S., at 320 [82 S.Ct. 1502 at 1521], that "[t]he deletion of the word 'community' in the original

[Clayton] Act's description of the relevant geographic market is another illustration of Congress' desire to indicate that its concern was with the adverse effects of a given merger on competition only in an economically significant 'section' of the country." In *Brown Shoe,* however, we found "relevant geographic markets" in cities "with a population exceeding 10,000 and their environs." Id., at 339 [82 S.Ct. 1502 at 1531]. Phillipsburg-Easton and their immediate environs had a population of almost 90,000 in 1960. Seven banks compete for their business. This market is clearly an economically significant section of the country for the purposes of § 7.

Under the circumstances of this case, in which it has not been disputed that several of the geographic areas in which both Empire and Pargas compete have populations in excess of 10,000 or more, *Brown Shoe* and *Phillipsburg* teach that, for purposes of its pending motion for preliminary injunctive relief, Pargas has demonstrated a probability of success in establishing a substantial lessening of competition within a number of relevant geographical markets. Section 7 by its own terms and as interpreted in such cases as *Procter & Gamble, supra,* requires only a showing that the result of a particular acquisition *may* be substantially to lessen competition in a line of commerce in an appropriate geographic market. While a showing of a speculative possibility of a diminution of competition would not appear sufficient to satisfy the requirements of section 7, the proof adduced to date in this case by plaintiff rises well above the level of speculation. It is possible that this Court may conclude after trial, or perhaps even before trial and after further presentation of documentary evidence and more detailed economic analyses of the alleged geographic markets pointed to by plaintiff, that the several areas in which plaintiff has charged a substantial lessening of competition are economically insignificant, or that no substantial threat to competition would result from a merger in any such area. In that latter connection, de-

fendants may be able to establish that LP-gas competition in some or all of the areas selected by Pargas should be viewed in the light of LP-gas competition afforded by suppliers located on the periphery of such areas. Nonetheless, at this juncture of this case, plaintiff has sufficiently established a probability of lessening of competition in a number of geographic areas so as to entitle it to preliminary relief herein.

■ This Court has also by no means lost sight of the need to keep in mind at this juncture of this case that if control of Pargas by Empire would lessen competition in only a limited number of communities, Empire may, at the conclusion of this litigation, demonstrate Empire's entitlement to assume control of Pargas provided appropriate divestiture arrangements have been devised to prevent anti-competitive effects within each of those communities. In urging that this Court enter a preliminary decree herein at this time pursuant to which Empire would be permitted to consummate its tender offer, purchase and pay for tendered stock, and have that stock held by a neutral person appointed by this Court on a "frozen" basis as to voting control, pending completion of this litigation, defendants have not only stated, as related· supra, a willingness to cure all Securities Act violations, if any such exist, in Empire's May 7, 1976 tender offer, and also cure all problems relating to the Regulations issues but in addition have stressed that if permitted so to proceed while this litigation is in process, Empire will, as of now, agree, at the end of this litigation, to dispose of such business of its own and of Pargas in any geographic area to the extent required by the antitrust laws. But as of this date, Empire has not set forth the details of any such possible divestiture plans. Indeed, seemingly, it would be most difficult prior to trial or at least at this time for Empire to do so. Thus, this Court has no way of weighing the impact of any such divestitures upon the public interest or even of determining whether such divestitures could cure all Clayton Act and/or Sherman Act violations which plaintiff may establish hereafter.

In *Missouri Portland Cement Co. v. Cargill*, 498 F.2d 851, 854 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), Judge Friendly has admonished district courts to remain attentive to the possibility that a company which is the target of a tender offer may "seek shelter under § 7 of the Clayton Act" to frustrate even legitimate acquisitions by a tender offeror, in the hope that such an offeror may "decline the expensive gambit of a trial". In this case, however, this Court is amply persuaded that the section 7 attack mounted by Pargas is far from frivolous.

### Potential Competition

Pargas also asserts that the acquisition of control of Pargas by Empire will violate section 7 of the Clayton Act by eliminating "potential competition" in areas in which Pargas and Empire are not presently engaged in actual competition. In *United States v. Marine Bancorporation*, 418 U.S. 602, 623–25, 94 S.Ct. 2856, 2871, 41 L.Ed.2d 978 (1973), Mr. Justice Powell has written:

The term "potential competitor" appeared for the first time in a § 7 opinion of this Court in *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 659 [84 S.Ct. 1044, 1048, 12 L.Ed.2d 12] (1964). *El Paso* was in reality, however, an actual-competition rather than a potential-competition case.[24] The potential-compe-

[24] The merger declared unlawful in *El Paso* "removed not merely a potential, but rather an actual, competitor." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1371 (1965). Accord, Berger & Peterson, Conglomerate Mergers and Criteria for Defining Potential Entrants, 15 Antitrust Bulletin 489, 498 (1970); ·Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Col.L.Rev. 1231, 1242 n. 36 (1968). Prior to the acquisition at issue in *El Paso,* the acquired firm had entered a tentative supply contract with one of the acquiring firm's substantial customers in the relevant market, compelling the acquiring firm to make significant price and delivery concessions in order to retain that customer. 376 U.S., at 654–655, 659 [84 S.Ct. 1044, at 1046–1047, 1048]. The acquired firm was thus "shown by [the] record to have been a substantial factor in the [relevant] market at the time it was acquired

. . . ." *Id.,* at 658 [84 S.Ct. 1044 at 1048]. The degree of entry that the acquired firm had achieved into the market of the acquiring firm distinguishes *El Paso* from subsequent cases truly presenting a potential-competition situation. It also distinguishes *El Paso* from the instant case, where the record demonstrates no analogous penetration of WTB's market by NBC or of NBC's market by WTB.

tition doctrine has been defined in major part by subsequent cases, particularly *United States v. Falstaff Brewing Corp.,* 410 U.S. 526 [93 S.Ct. 1096, 35 L.Ed.2d 475] (1973).[25] Unequivocal proof that an acquiring firm actually would have entered *de novo* but for a merger is rarely available.[26] Thus, as *Falstaff* indicates, the principal focus of the doctrine is on the likely effects of the premerger position of the acquiring firm on the fringe of the target market. In developing and applying the doctrine, the Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market. In other words, the Court has interpreted § 7 as encompassing what is commonly known as the "wings effect"— the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo*. *Falstaff, supra,* at 531–537 [93 S.Ct. 1096 at 1100–1103].[27] The elimination of such present procompetitive effects may render a merger unlawful under § 7.[12]

*See also United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226, 1231–62 (C.D.Cal. 1973), and authorities cited thereat, *aff'd,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

In this case, Pargas has come forward with evidence indicating that Empire's current acquisition and expansion policies and Pargas' stature in the LP-gas industry make both of those corporations prime potential entrants into all LP-gas markets throughout the country in which Pargas and Empire do not presently compete. Further, the record indicates that the LP-gas industry evidences considerable concentration. In addition, the undisputed record evidence with regard to Empire's size and corporate vigor seemingly speaks for itself in establishing a substantial likelihood that Empire's acquisition of control of Pargas could, in numerous areas throughout the country, eliminate restraints currently exercised by the evidence of Empire as a potential entrant. While this Court might well not be willing to rest its within decision to grant the type of preliminary injunctive relief set forth in its June 2, 1976 Order upon plaintiff's potential competition argument alone, this Court is of the opinion that that consideration supports its conclusion that such preliminary relief is mandated by section 7 of the Clayton Act.

### *The Regulations Issues* [13]

In addition to asserting that it is entitled to preliminary injunctive relief preventing Empire from consummating its tender offer on the antitrust and disclosure grounds discussed *supra,* Pargas asserts that, on an independent basis, it is entitled to similar relief because Empire's financing of its tender offer has been obtained in violation of one or more regulations of the Federal Reserve Board, and of one or more provisions of the Securities Exchange Act of 1934. In the context only of plaintiff's quest for preliminary injunctive relief as embodied in this Court's Order filed June 2, 1976, this Court makes the following findings of facts. As it has done in the course of making all of its other factual findings in this opinion, this Court has given careful consideration to all exceptions stated by

---

**12.** Footnotes 25–27, inclusive, are omitted.

**13.** The statute and the regulations under which those issues arise are summarized in the first paragraph on pp. 238–239 *infra.*

defendants to plaintiff's proposed findings of facts as well as to all affirmative suggestions by defendants as to such findings. Because of the time pressures relating to preparation including typing of this opinion, this Court has utilized, by xeroxing, pasting and the like, those parts of plaintiff's proposed findings to the extent but only to the extent that this Court has independently determined such proposed findings are supported by the record and to the extent that this Court, after such independent examination, is prepared to adopt all of the same as its own.[14]

1. On May 6, 1976 Continental and Mercantile entered into a Term Loan Agreement with Empire by which Continental agreed to loan Empire $45 million and Mercantile agreed to loan Empire $5 million ("the loan agreement"). Paragraph 1.1 of the loan agreement states that the purpose of the loan is, in part, to finance "the purchase of common stock of Pargas Inc. at a price not to exceed $18.50 per share . . . ." [Plaster Dep., Ex. 78, see Plaintiff's Ex. 1, Tab 19].

2. During negotiations with Continental and Mercantile for this loan, Empire furnished *pro forma* financial statements on Empire and Pargas to both banks which reflect that, if the tender offer were consummated, a total of $50 million *might* be "up-streamed" from Pargas to Empire through long-term loans from Pargas to Empire. These *pro formas* show that cash for these loans would be generated in *Pargas, inter alia,* by the following means:

(i) Dividends payable to Pargas shareholders would be eliminated;

(ii) Assets of Pargas would be sold;

(iii) Fixed assets of Pargas would not be replaced as rapidly as they depreciated; and

(iv) Pargas operating inventories would be substantially reduced. [Ex. C to Plaster Dep., Ex. 78; see Plaintiff's Ex. 2, Tabs 2 and 3].

3. The Financial Vice-President of Empire has stated that said *pro formas* do not represent Empire's present intentions. [Leivan Aff.; Empire Memorandum I, Ex. 4, ¶ 9].

4. Both Continental and Mercantile received and gave some consideration to these *pro forma* statements. [Miller Dep. at 25–26; Continental Dep., Ex. 1].

5. When presented with these *pro formas,* a Continental official wrote a memorandum which stated that "Empire's projected cash flow statements reveal that they are planning for the acquired company to upstream the funds to Empire to amortize the debt." [Langdon 3/18/76 memo at 2, Continental Dep., Ex. 1].

6. These *pro formas* were attached to the May 6, 1976, Term Loan Agreement as Exhibit C thereto, and are specifically referred to in paragraph 1.6 of that agreement. [Plaster Dep., Ex. 78; see Plaintiff's Ex. 1, Tab 19 at 2; see caption on Plaintiff's Ex. 2, Tab 2].

6A. Paragraph 3.1–C of the May 6, 1976 Term Loan Agreement provides, in part, that until the credit is paid off, neither Empire "nor any subsidiary will, without the prior written consent of" Continental and Mercantile—

(i) Create, incur, assume or suffer to exist any pledge, mortgage, assignment or other encumbrance of or upon any of its assets or property, or of or upon the income or profits thereof . . . or permit to exist any agreement containing a provision prohibiting the creation of any such pledge, mortgage, assignment or other such encumbrance, . . . provided, that this paragraph shall not restrict the right of the Company or any subsidiary to sell, transfer, pledge, hypothecate, or otherwise convey or encumber any stock, any security commonly known as stock, any voting trust certificate or other instrument representing such a security, and any security convertible, with or without consideration, pres-

---

**14.** *See United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 656–57, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); C. Wright and A. Miller, Federal Practice and Procedure ¶ 2578 (1971); 5A J. Moore, Federal Practice, ¶ 5206[3] *et seq.* (1975).

ently or in the future, into such security, certificate, or other instrument, or carrying any warrant or right to subscribe to or purchase a security, or any such warrant or right.

Other similar restrictions on the ability of Empire and its subsidiaries to encumber or use their assets and monies are contained in the Agreement.

Paragraph 2.1–D of the Term Loan Agreement defines "subsidiary" as follows:

* * * The terms "Subsidiary" or "Subsidiaries" as used herein shall mean any corporation in which the Company owns more than 50% of the stock qualified to vote for the election of directors thereof.

Thus, if Empire acquires 2,000,000 shares of Pargas common stock, as is Empire's publicly announced intent in this tender offer (or if Empire acquires more than a majority of Pargas shares), Pargas will be a "subsidiary" of Empire, and all of the assets of Pargas will be subject to all of the restrictive covenants of the Term Loan Agreement.

7. Beginning in the fall of 1975, Empire, having terminated its previous investment banking relationship, was seeking to establish an investment banking relationship with a major investment banking house. [Plaster Dep., Vol. 2, at 42; Thompson Dep., at 5; Thompson Dep., Ex. 3].

8. Prior to February 1976, Empire had talked to at least three major, national investment bankers about representing Empire in all of its investment banking needs. [Thompson Dep., at 13; Thompson Dep., Ex. 2].

9. On a number of occasions, beginning in November, 1975, Plaster, President of Empire, consulted with a number of officers of Blyth Eastman Dillon & Co., Incorporated ("Blyth Eastman"), including William I. Thompson ("Thompson") a Senior Vice President in the Corporate Finance Department, with reference to the possibility of Blyth Eastman acting as an investment Banker for advice and assistance in considering diversification and acquisitions, and raised the question of how Blyth Eastman felt about "being dealer manager in tender offers that might turn out to be unfriendly." On or about February 10, 1976, Plaster consulted with Thompson with specific reference to the possibility of Blyth Eastman acting as a dealer-manager for Empire's tender offer for Pargas' common stock. [Thompson Dep., at 5–12, 26, 29–30; Plaster Dep., Vol. 2, at 42–44].

10. Blyth Eastman is a registered broker-dealer within the meaning of Section 7(c) of the Securities Exchange Act of 1934. [Amended Complaint, ¶ 61].

11. At a meeting on February 10, 1976, Plaster advised Thompson that Plaster had authority from the Empire board of directors to retain Blyth Eastman as Empire's investment banker. Plaster wanted Blyth Eastman to represent Empire in future underwritings, "all phases of financing, public and private, mergers, what-have you." Plaster also said that Empire would like Blyth Eastman to be dealer-manager in the proposed tender offer by Empire for Pargas common stock. Thompson replied that Blyth Eastman management would have to approve Blyth Eastman's being dealer-manager in the proposed tender offer. In January, 1976, when Empire broached to Blyth Eastman the possibility of its being dealer-manager of an unfriendly tender offer, Blyth Eastman officials replied that Blyth Eastman had never been dealer-manager of an unfriendly tender offer, but had always attempted to work out tender offers in an amicable fashion, and that Blyth Eastman would do its best to work out such a transaction in that manner. [Thompson Dep., at 17–18, 100].

12. Because of Plaster's request, Thompson prepared a memorandum on February 12, 1976, for the Blyth Eastman operating committee. Thompson's memorandum to the operating committee states that Plaster, in addition to wanting Blyth Eastman as dealer-manager, was also asking Blyth Eastman "to assist him in arranging the bank financing for the tender." [Thompson Dep., at 18–19; Thompson Dep., Ex. 3].

13. The Blyth Eastman operating committee determined that Blyth Eastman "would do whatever it could to work out a friendly deal," but that it "would not favor being dealer manager in an unfriendly tender." [Thompson Dep., at 25–26].

14. Thompson communicated the decision of the Blyth Eastman operating committee to Plaster. Plaster told Thompson that he hoped Blyth Eastman would "rethink" its decision as to being dealer-manager of an unfriendly tender offer, but that even if Blyth Eastman were not dealer-manager of the tender offer, Empire desired Blyth Eastman's assistance in at least two areas: [Thompson Dep., at 25–26, 28, 118–19];

a. To help Empire secure a source of funds for the tender offer, and [Thompson Dep., at 28, 34];

b. To advise Empire as to what the tender price ought to be. [Thompson Dep., at 34].

15. Thompson suggested to Plaster that he might personally meet with Blyth Eastman's top management in an effort to become better acquainted and, perhaps, to get them to rethink their decision on being dealer-manager of an unfriendly tender offer. [Thompson Dep., at 119–20; Thompson Dep., Ex. 5].

16. Both Plaster and Thompson expressed their views that despite the operating committee's difficulty with unfriendly tender offers, they desired that Empire and Blyth Eastman have a "long-term relationship." [Thompson Dep., at 121].

17. Blyth Eastman reached a tentative decision to charge a "financial advisory fee" to Empire for rendering the services requested by Empire, if, when the tender offer was completed, Blyth Eastman determined it had rendered sufficient service to justify the fee. [Thompson Dep., at 124; Thompson Dep., Ex. 6].

18. After the tender offer was made, Thompson unilaterally determined not to charge Empire a "financial advisory fee," without consulting anyone else at Blyth Eastman, on the basis that Blyth Eastman's involvement had been "so minimal" that such a fee was unjustified. [Thompson Dep., at 125–26].

19. At its February 10, 1976 meeting, the operating committee suggested that Thompson check with two of Blyth Eastman's existing LP-gas customers to insure that they had no objections to Blyth Eastman's representation of Empire. Following the meeting, Thompson checked with both of these customers and found that they did not object to Blyth Eastman's representation of Empire. [Thompson Dep., at 26–28, 115–16; Thompson Dep., Ex. 5].

20. Thompson next checked with other officers in the Corporate Finance Department of Blyth Eastman for names of possible lenders for the proposed tender loan to Empire. Thompson initially obtained names of four different banks, and later obtained a list of eight banks (which included all on the first list) with names of Blyth Eastman officers who had worked with each bank. This latter list included Republic National Bank of Dallas and Continental. [Thompson Dep., at 28–29, 45–47, 117, 134–35].

21. Thompson thereafter conducted discussions with First National Bank of Chicago and Republic National Bank of Dallas in turn, about the possibility of each bank making the tender loan to Empire. Both First of Chicago and Republic declined to make the loan. [See more detailed findings of facts at ¶¶ 35–43 herein].

22. In connection with its efforts to find a lender for the Empire tender loan, Blyth Eastman prepared a detailed analysis of Empire and Pargas financial statements, including analysis of the Empire and "target company" *pro formas* prepared by Empire. The purpose of this analysis was to anticipate questions a bank might ask Empire about the proposed financing. In preparation for a meeting with the Republic National Bank, Thompson also prepared a checklist of "problem" areas that that bank might inquire about, and Thompson questioned Plaster on these "problem" areas in preparation for the first meeting with Republic on March 2, 1976. [Thompson Dep.,

at 48–49, 52–53, 137–40, 141–48; Thompson Dep., Ex's. 8 and 9].

23. In connection with its efforts to advise Empire on a proper tender price, Blyth Eastman took the following actions:

a. Initially, Blyth Eastman advised Empire in January, 1976 that Empire should not attempt to buy Pargas "too cheaply," and that low tender prices in the past had incurred immediate opposition from target company management. [Thompson Dep., at 10, 106];

b. In connection with this advice, Thompson took from his general "Tender Offer" file and placed in his "Empire" file detailed statistical comparative information on prices and premiums over market and over book value offered in other tender offers of $10 million or more since January 1, 1974, which Blyth Eastman had previously compiled, [Thompson Dep., at 93];

c. At the April 5, 1976 meeting in the offices of Skadden, Arps, Slate, Meagher & Flom, special counsel to Empire ("Skadden, Arps") to plan the tender offer, Thompson stated that the price of the offer should not be discussed at the meeting because it was a "very sensitive matter," and that Blyth Eastman was giving consideration to that matter with an objective of recommending a price satisfactory to Pargas shareholders with a view to working out a deal on a friendly basis, and [Thompson Dep., at 165–66];

d. Between April 5 and 21, 1976, Thompson conferred twice with Plaster. Thompson's notes of that latter conversation are captioned "Strategy", and include the notation "[p]ay good price". Those same notes include the notation "*Must leave out* Blyth Eastman Dillon out of the deal" (Emphasis in original), apparently reflecting information communicated to him by Plaster. [Thompson Dep., at 78–79, 172–74; Thompson Dep., Ex. 17].

24. In connection with its efforts to make the tender offer a "friendly" one, Blyth Eastman took the following actions:

a. It advised Empire in January 1976 that a "friendly" approach was often times

better than "walking into a buzz saw" and that Blyth Eastman would work to make the tender offer a friendly one to the Pargas shareholders and management, [Thompson Dep. at 104];

b. Thompson discussed with the Blyth Eastman operating committee on February 12, 1976, the prospects of putting a "friendly" tender offer together and the prospect that Blyth Eastman would be dealer-manager if a "friendly deal" could be arranged, [Thompson Dep. at 117];

c. Thompson discussed with others at Blyth Eastman the possibility of negotiating to buy an 11 percent block of Pargas stock from Mrs. Parkett, a Pargas stockholder, [Thompson Dep. at 33, 123; Thompson Dep., Ex's 5 and 6];

d. Thompson made a tentative decision to charge Empire a "financial advisory fee," in part, for any services rendered in negotiating to buy a block of stock from a Pargas stockholder on a friendly basis, provided they "were able to render sufficient service to justify one", [Thompson Dep. at 33, 123–34; Thompson Dep., Ex. 6];

e. Thompson was present at an April 5, 1976 meeting at which there was discussion of the concept of a friendly approach to major Pargas shareholders prior to the tender offer in an effort to acquire their shares in a manner acceptable to them so that they would be in favor of a proposed subsequent combination of the two companies, [Thompson Dep. at 161–63];

f. At this meeting, the concept of buying blocks of shares from major shareholders on a friendly basis in advance of the tender offer was discussed, [Thompson Dep. at 164–65; Thompson Dep., Ex. 15]; and

g. Following the April 5 meeting, Thompson discussed with Plaster the possibility of visiting the four major shareholders in an attempt to work out the tender offer on "some sort of a friendly basis". Thompson also consulted his counsel about the legality of first buying blocks of stock from major Pargas stockholders and then making a tender offer for the remaining

Pargas shares. [Thompson Dep. at 81–82, 173; Thompson Dep., Ex. 17].

25. On March 25, 1976, Plaster advised officials of Continental that Empire intended to approach major Pargas stockholders and Pargas' management with an offer to acquire the company prior to the tender offer and that only if that approach were unsuccessful would a tender for Pargas shares be made. A Continental official wrote a memorandum after this conference that "[t]here is no indication at this time that such a tender would be anything but friendly." [Continental Dep., Ex. 3 at 1].

26. Blyth Eastman conducted other services for Empire as follows:

a. Blyth Eastman advised Empire in January 1976 on possible diversification opportunities in the lumber, food and/or printing industries, [Thompson Dep. at 9, 101–03; Thompson Dep., Ex. 1];

b. Blyth Eastman at one or more times consulted with Empire on potential antitrust problems which might be encountered in the tender offer, [Thompson Dep. at 16, 109–10; Thompson Dep., Ex's 2, 3, and 8]; and

c. Blyth Eastman advised Empire on general tender offer problems relating to Williams Act disclosure, state anti-takeover statutes, problems of arbitrageurs and pro-rating, and possible defensive measures that might be taken by Pargas management. [Thompson Dep. at 48, 81–82, 137–40, 165; Thompson Dep., Ex. 8].

27. On April 21, 1976, Thompson telephoned Plaster to find out the status of the financing and where the transaction stood, and also to say that Blyth Eastman still wanted to work the tender offer out in an amicable way. Thompson offered to contact Pargas or a Pargas representative if that would be helpful. [Thompson Dep., at 79].

28. In that conversation, Plaster stated that he had been advised by counsel that Blyth Eastman could not be dealer-manager in the proposed tender offer, and indeed had to be "out of the deal", because of the potential Regulation T "problem" created by Thompson's contact with Continental. [Thompson Dep. at 79].

29. Blyth Eastman and Empire have not to date formed a business relationship, nor has Blyth received any compensation from Empire for services rendered. Empire has no present plans to use Blyth Eastman as an investment banker in the foreseeable future. [Thompson Dep. 81, Plaster Aff., ¶ 3].

30. Robert W. Plaster, ("Plaster") President of Empire, determined sometime during the summer of 1975 that Pargas might be a suitable target for a takeover. [Plaster Dep., Vol. 1, at 24; Plaintiff's Exhibit 1, Tab 12].

31. To finance its planned tender offer, Empire had at an early date sought a loan commitment from its own lead bank, First National Bank of Chicago ("First of Chicago"). On September 2, 1975, the First of Chicago advised Empire that it had a policy against involvement in "unfriendly", i. e., contested, tender offers, and would not participate in an unfriendly tender offer for Pargas. [Plaster Dep., Vol. 1, at 24; Vol. 2, at 18; Plaster Ex. 6, See Plaintiff's Exhibit 1, Tab 14; Thompson Dep., at 14; Langdon Dep., at 12].

32. Plaster again conferred with officials of First of Chicago on January 16, 1976, and asked First of Chicago to reconsider its earlier position, but First of Chicago again declined to participate. [Plaster Dep., Vol. 1, at 48; Plaster Exhibit 8].

33. On March 3, 1976, Plaster approached officials of Equitable Life Assurance Company about making the tender loan. Equitable responded that it was not interested in making the initial tender loan, but that after the initial loan was made, Equitable might be interested in a loan to Empire which would enable Empire to "take out" the initial tender-loan lender. [Plaster Dep., Vol. 1, at 48–49; Plaster Dep., Ex. 9; Thompson Dep., at 13–14, 24, 107–08; Thompson Dep., Ex. 2].

34. On February 12, 1976, Plaster requested Thompson and Eastman to assist Empire in, among other things, locating a

lender for the tender loan. Plaster advised Thompson of his previous contacts with First of Chicago and Equitable. [Thompson Dep., at 28, 34, 118–19; see Thompson Dep. Exhibits 5 and 6].

35. On February 20, 1976, Thompson telephoned Al Johnson of First of Chicago to discuss the Empire tender loan and to verify First of Chicago's position as related by Plaster. Johnson stated that the First of Chicago staff had recommended approval of the tender loan to Empire, but the chairman of the board, Mr. Abboud, had rejected the proposed loan. Johnson said that First of Chicago had reviewed the pro formas and found the loan to be heavily leveraged at the then proposed tender price of $17, and that the loan would have to be amortized out of Pargas dividends. [Thompson Dep., at 34–41, 127–28; Thompson Dep., Ex. 6].

36. Following this conversation between Thompson and Johnson, Plaster informed Thompson that First of Chicago had stated to Plaster that it was reconsidering its position on the Empire tender loan, in part, because Blyth Eastman was now assisting Empire in finding a source of funds. [Thompson Dep., at 52, 140–41; Thompson Dep., Ex. 8].

37. At some time between February 12 and 20, 1976, Thompson telephoned H. R. Sanders of Republic National Bank of Dallas ("Republic") to inquire whether Republic would be interested in making an unsecured tender loan to Empire. [Thompson Dep., at 31–32; Thompson Dep., Ex. 5].

38. Thompson had obtained Sanders' name from another Blyth Eastman officer. [Thompson Dep., at 122; Thompson Dep., Ex's 5 and 7].

39. Following this initial conversation, Thompson sent Sanders the Empire *pro formas* and the financial statements of Empire and Pargas. [Thompson Dep., at 122–23].

40. On or about February 26, 1976, Thompson spoke to John Bunten, Executive Vice President of Republic. A meeting between Empire and Republic was scheduled by Thompson for March 2, 1976. [Thompson Dep., at 42–45, 50–51, 133–34, 140; Thompson Dep., Ex's 6, 7 and 8].

41. Thompson attended the March 2, 1976 meeting between Empire and Republic. [Thompson Dep., at 55–56, 149–50; Thompson Dep., Ex. 12].

42. Thompson telephoned Republic the day after the meeting and learned that Republic's initial reaction was favorable to making the tender loan to Empire. [Thompson Dep., at 57–58; Thompson Dep., Ex. 13].

43. However, on March 10, 1976, Bunten telephoned Thompson and said Republic would not make the loan because it was a little too large and the situation "had a potential to become nasty". Bunten said that if it worked out that the tender was a friendly one, Republic might be interested in participating. Thompson responded that Blyth Eastman was working to make the tender friendly. [Thompson Dep., at 58–59, 61, 150–51; Thompson Dep., Ex. 13].

44. Thompson asked Bunten if he knew of other possible lenders for the Empire tender loan and Bunten mentioned three banks, including Continental. Thompson asked Bunten what Continental's loan limit was, and Bunten said it was $100 million. [Thompson Dep., at 60–61, 151–52; Thompson Dep., Ex. 13].

45. On March 12, 1976, Thompson telephoned Alvin J. Pearson, Vice President of Continental having jurisdiction of the Oil and Gas Section of the Division of Energy and Natural Resources of Continental, whom Thompson had met briefly at a dinner party given by Continental during an American Petroleum Institute convention in November 1975. Pearson did not recall who Thompson was. After Thompson explained who he was, Thompson inquired whether Continental would be interested in financing a tender offer. Prior to that date, Pearson had never heard of Empire or Plaster. [Thompson Dep., at 63–65; Pearson Dep., at 10–12, 85].

46. Thompson specifically asked Pearson if Continental had philosophical problems with an unfriendly tender offer, and Pear-

son replied that it did not. [Thompson Dep., at 64–65, 154; Pearson Dep., at 12–14].

47. Thompson told Pearson that the First National Bank of Chicago, Empire's principal bank, had turned down Empire's request for a loan. Thompson told Pearson the name of the target company, the amount of the proposed loan, and the fact that there was a possibility Empire would establish a banking relationship with Continental as its principal commercial bank if it financed the tender offer. [Thompson Dep., at 65, 155–56].

48. Thompson discussed the proposed transaction with Pearson to see whether Continental would be interested in proceeding with it, and offered to send Pearson relevant documents. Thompson did send Pearson the annual reports and *pro forma* financials of Empire and the *pro forma* financials for Pargas. Pearson does not recall receiving such financial data. [Thompson Dep., at 65; Pearson Dep., at 12].

49. On March 15, 1976, Pearson telephoned Thompson and stated that Continental was most interested in making the loan to Empire, and he desired to meet with representatives of Empire. [Thompson Dep., at 65–67].

50. Thompson phoned Plaster after he learned of Continental's possible interest in making the loan. Thompson advised Plaster that he believed an unfriendly tender would be looked upon with favor by Continental, suggested that Plaster call Pearson at Continental, and determined Plaster's availability to meet with Continental officials. In his own words, Thompson "proceeded to set up" a March 18 meeting in Chicago between Plaster and Pearson and others at Continental. Thereafter, Thompson had no specific recollection of further conversations with Pearson, but upon reviewing his notes stated that some subsequent conversations did take place. [Thompson Dep., at 66–67, 176–79; Plaster Dep., Vol. 2, at 17–18; Plaintiff's Ex. 1, Tab 12].

51. Plaster called Pearson the same day he received the phone call from Thompson. A meeting was arranged for March 18, 1976 at Continental. [Plaster Dep., Vol. 2, at 32–33; Pearson Dep., at 20].

52. At this time, Blyth Eastman had not given Empire a final decision on their removal from consideration as dealer-manager for the tender offer. [Plaster Dep., Vol. 2, at 44, 57].

53. At this time, Plaster and Empire were still searching for a major investment house to do business with, and earlier, in February of 1976, had been "leaning very hard in favor of doing business with Blyth Eastman." [Plaster Dep., Vol. 2, at 42].

54. Prior to being introduced to Continental by Thompson, Empire had no banking or other relationship with Continental. [Plaster Dep., Vol. 3, at 10].

55. Plaster met with four Continental officers and employees, including Pearson, at the offices of Continental on March 18, 1976. A memorandum of the meeting, written by Richard Langdon, a Continental official, states that the meeting was "[a]t the suggestion of Bill Thompson of Blythe, Eastman, Dillon, [sic]" and that Blyth Eastman was, together with Bacon, Whipple & Co. and Georgeson of New York, part of an "advisory team" Empire had formed for the offer. [Plaintiff's Ex. 2, Tab 5; Pearson Dep., at 20].

56. Plaster negotiated a loan commitment with Continental. On April 5, 1976 Continental issued a commitment letter to Empire whereby Continental would lend Empire $50,000,000 to finance the tender offer and pay off an outstanding loan of $9,500,000 to Empire from the First National Bank of Chicago. [Plaintiff's Ex. 1, Tab 17].

57. When Continental decided to approve the loan, Pearson asked Langdon, an official of Continental, to call Thompson and tell him the loan was approved. Langdon so did, and thanked Thompson for "referring the situation to us". [Pearson Dep., at 70; Thompson Dep., at 69–70].

58. Pearson has stated that Thompson's telephone call in no way influenced Pearson's recommendation that the said commitment letter be approved. [Pearson Dep., at 89–90].

59. On April 5, 1976 Thompson attended a meeting in the offices of Skadden, Arps, who had been retained as Empire's special counsel for the tender offer. The purpose of the meeting was to plan various aspects of the tender offer. The meeting was attended by, *inter alia,* Thompson, Plaster, Robert S. Pirie ("Pirie") and Theodore Kozloff ("Kozloff") of Skadden, Arps; William Robinson of Georgeson's, Empire's tender offer solicitation experts; Frank Schanck, a principal of Bacon, Whipple & Co.; Wayne Roper, as Empire director and counsel; and Jack Whitney, counsel for Bacon, Whipple & Co. Plaster, Schanck and Roper comprised the entire Empire executive committee. Thompson attended the meeting at Plaster's request. At that meeting, discussion took place with regard to the possibility that the tender offer could be effected in a friendly manner by first approaching owners of large blocks of Paragas shares. Thompson hoped that a friendly tender offer could be arranged, and that Blyth Eastman would be dealer-manager. [Thompson Dep., at 70, 164–65; Plaster Dep., Vol. 1, at 52; Plaintiff's Ex. 1, Tab 13].

60. At the April 5 meeting, Pirie and Kozloff advised those present that Blyth Eastman's and Thompson's conduct, because Thompson initiated the contact with Continental, might be construed to amount to "arranging credit," in violation of Regulation T, as that Regulation was interpreted in *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532 (D.Del.1975). [Thompson Dep., at 71–74, 160–61; see also Plaster's Dep., Vol. 2, at 61–63; Plaintiff's Ex. 1, Tab 18].

61. Thompson consulted Cravath, Swaine & Moore, for their opinion as to whether or not Regulation T was violated. Thompson was advised by Cravath, Swaine & Moore that there was a Regulation T problem in this case. [Thompson Dep., at 73–74, 169].

62. An "off-the-record inquiry" was made by Skadden, Arps to the Federal Reserve Board, on "a no-name basis," to obtain its view as to the scope and applicability of Regulation T in a situation where all a broker-dealer had done was to inquire: "Would XYZ bank be interested in banking this company generally as well as for the tender offer?". The Federal Reserve Board advised that even such facts rendered it "inadvisable" for a bank "to proceed with the transaction with respect to Regulation T." [Thompson Dep., at 76].

63. On April 6, 1976, at Pirie's suggestion, Plaster told Continental of the Regulation T problem and suggested they should review it with their own counsel. [Plaster Dep., Vol. 2, at 70; O'Keane Dep., at 44; Thompson Dep., at 170; Pearson Dep., at 53–55].

64. Continental consulted its counsel and were advised that "the Reg T problem was something that would probably be attacked if the tender should in fact turn out to be unfriendly." [Pearson Dep., at 57].

65. After considering the Regulation T problems, Continental reviewed the April 5 commitment letter and reached the conclusion that it should withdraw it. This decision was communicated to Empire. [Plaster Dep., Vol. 2, at 70].

66. Continental took no formal action to withdraw the commitment letter, and on April 12, Empire allowed the April 5, 1976 commitment letter to lapse by its own terms. [O'Keane Dep., at 42–44; Continental Dep., Ex. 6].

67. On or about April 5, 1976, after learning of the Regulation T "problem" with the Continental loan, Plaster stated that he intended to again approach First of Chicago on April 6, 1976, about reconsidering its earlier position on the tender loan. [Thompson Dep., at 77, 169–71].

68. On or before April 8, 1976, Duane Pemberton, President of the subsidiary Mercantile Bank in Springfield, Missouri, called Donald E. Lasater, Chairman of the Board and Chief Executive Officer of the Mercantile Trust Company and Mercantile

Bank Corporation, and arranged for Lasater to meet with Plaster and himself at lunch on April 14, 1976 in St. Louis, Missouri. On April 14, 1976 those individuals discussed the possibility of Mercantile's financing a proposed tender offer for the stock of an unnamed "Target Company". At that time Empire and Mercantile had an existing banking relationship. In fact Mercantile was Empire's regular commercial bank and Empire had a $5 million line of credit at Mercantile. [Lasater Dep., at 3–4; Miller Dep., at 4–5].

69. Plaster did not contact Mercantile in the first instance because he knew that Mercantile's loan limits barred it from making a loan of that magnitude, and he would have preferred to arrange the loan without a syndication. [Plaster Dep., Vol. 2, at 67–68].

70. Plaster had a meeting with the officers of Mercantile on April 14, at which he informed them of the difficulty in securing a loan he had because of the policy of the First National Bank of Chicago in not financing unfriendly tender offers, and the Regulation T problem he had with the lapsed loan commitment from Continental. [Plaster Dep., Vol. 2, at 64–65].

71. Plaster explained to the officers of Mercantile the circumstances of the relationship between Empire and Continental. One or more of said officers eventually received a copy of the April 5, 1976 Continental commitment letter. [Miller Deposition at 19–20; Miller Deposition Ex. 2; Plaster Deposition, Vol. 2, at 65].

72. At the said April 14, 1976 meeting Mercantile was noncommittal as to its willingness to make the loan. On April 15, 1976, Mercantile had tentatively determined to participate in a loan to Empire of up to $5,000,000, subject to obtaining "a suitable partner or partners in credit", and contacted Continental and invited Continental to participate in the tender offer financing. [Plaster Dep., Vol. II, at 63–64; Lasater Dep., at 3–8, 11; Miller Dep., at 21; Miller Dep., Ex. 3].

73. Continental and Mercantile as of April 15, 1976 had a "very active" corre-

spondent relationship, one of the largest maintained by Mercantile. Mercantile would look to Continental for guidance on a credit of the size involved in the Empire transaction. [Miller Dep., at 54; Lasater Dep., at 7].

74. Harrison F. Coerver, President of Mercantile, wrote a memorandum on April 16, 1976, concerning his contacts with O'Keane, Vice President of Continental, about the proposed loan. Coerver wanted to talk to Continental "to determine how Regulation 'T' might affect their present position". Coerver told O'Keane that Mercantile's participation "could be as little as $2,500,000 having in mind that O'Keane might want to have this information for the benefit of discussions with his Counsel in determining the extent of interest in the loan request". The memorandum by Coerver concludes: "O'Keane's advice to me was that we would have to prepare all of the loan documents and submit them for approval, and I told him that I could appreciate this." [Plaintiff's Ex. 2, Tab 8].

75. Counsel for Mercantile and counsel for Continental reviewed the Regulation T situation and decided it was proper for the banks to proceed. [Miller Dep., at 30, 57].

76. Langdon, a Continental official, wrote a memorandum dated April 23, 1976, of a meeting between the representatives of Mercantile and Continental. The memorandum states that Empire had informed Mercantile of Continental's previous commitment and the Regulation T problem, but that Empire had suggested that Mercantile contact Continental because, in light of Continental's "familiarity with the company, our close correspondent relationship with Mercantile and in the interest of time", it would be a "logical participation candidate" in the loan. Lasater has stated that Plaster never suggested to him that Continental might be willing to participate with Mercantile in a syndication. Langdon's memorandum notes that the "only difference between" the proposed loan from Mercantile and the Continental commitment letter of April 5, 1976 was (1) the elimination in the former of the require-

ment that Empire make its tender offer contingent upon receipt of 51% of Pargas' stock and (2) an acceleration of the amortization on the loan. Langdon has since testified that the former also substituted a provision requiring prepayment of 75% of the proceeds obtained from the sale of assets for a provision requiring prepayment when Empire's earning exceeded its projections. [Plaintiff's Ex. 2, Tab 6; Lasater Dep., at 6; Langdon Dep., at 44–57; *see also* O'Keane Dep., at 32–39].

77. Prior to April 20, 1976, O'Keane of Continental indicated to Miller of Mercantile that Continental would "like to participate" in the $50 million loan to Empire. Miller confirmed to O'Keane that Mercantile would act as agent and would request Continental's participation in the amount of $45 million. O'Keane stated that Continental would participate, and that Continental would attend a meeting "to negotiate or to find out what" Mercantile "had negotiated in effect with" Empire. [Miller Dep., at 31–32].

78. On April 23, 1976, Continental and Mercantile met and drafted the provisions of a Term Loan Agreement by which $50 million would be loaned by Continental and Mercantile to Empire to use for a tender offer for Pargas stock. Continental and Mercantile agreed at that time that both banks would sign the Term Loan Agreement. In drafting these provisions, Mercantile asked for Continental's judgment on a number of matters, since Mercantile was aware that Continental "had spent considerable time looking at this loan at a point in the past". The final loan agreement was also based, to some extent, upon a term loan agreement between Empire and the First National Bank of Chicago and a term loan agreement which Mercantile had offered Empire in 1975. [Miller Dep., at 33–34, 36–37, 39].

79. After agreeing on the provisions of the Term Loan Agreement, Continental and Mercantile then drafted a commitment letter which, on its face, indicates that it is a loan commitment of $50 million from Mercantile, jointly with Continental, to Empire.

[Miller Dep., at 33, 36; McClure Dep., at 10; PlaintiffS Ex. 2, Tab 9].

80. The Mercantile commitment letter is virtually identical in language and style to the Continental commitment letter of April 5th with the exception of certain changes suggested by Plaster, Empire's counsel, or Continental. One of the changes from the April 5th Continental commitment letter was an accelerated amortization schedule that was made at the request of Continental. No changes from the original Continental commitment letter were recommended by Mercantile. The Mercantile commitment letter was executed by Continental as well as Mercantile. [Plaintiff's Ex. 2, Tab 9; Plaster Dep., Vol. 2, at 74–80; Langdon Deposition, at 57].

81. On April 23, 1976, at the same time the Mercantile commitment letter was given to Empire, Mercantile had Continental, whose name is mentioned prominently in said commitment letter, execute a file copy of this same letter which showed that Continental and Mercantile were both making the April 23, 1976 commitment to Empire. This was done because Continental's "participation" in the loan was 90% while Mercantile's was only 10%. Empire accepted the commitment letter on April 27, 1976. [Miller Dep., at 44–46; Plaintiff's Ex. 2, Tab. 9; Miller Dep., Ex's 8 and 12].

82. Pearson has stated that Thompson's phone call in no way affected Continental's decision to participate with Mercantile in the tender offer loan. O'Keane has also so stated, and has stated that the question of whether Continental's decision was so affected is "a speculative question". At the time the Mercantile loan was negotiated, according to Thompson, Blyth Eastman and Thompson were not in contact with Empire and did not know, prior to a telephone call from Plaster to Thompson on April 21, 1976, of Empire's dealings with Mercantile. [O'Keane Dep., at 79; Pearson Dep., at 89–90; Thompson Dep., at 79–81].

## Legal Analysis

Section 7(c) of the 1934 Act, which restricts the power of broker/dealers to ar-

range loans financed by other parties, provides, in pertinent part, that no broker may "arrange for the extension or maintenance of credit to or for any customer * * * without collateral or on any collateral other than securities." Regulation T, 12 C.F.R. § 220.109, provides, in pertinent part, that a "creditor", defined by 12 C.F.R. § 220.2(b) to include any "broker", "may arrange for the extension or maintenance of credit to or for any customer of such creditor by any person upon the same terms and conditions as those which the creditor * * * may himself extend * * * to such customer, *but only upon such terms and conditions.* (Emphasis supplied). Regulation X of the Federal Reserve Board, 12 C.F.R. § 224, makes it illegal for a borrower to obtain credit from a broker in excess of what a broker can lend under Regulation U of the Federal Reserve Board, 12 C.F.R. § 221.

In accordance with the type of procedure proposed by Mr. Justice Harlan in *Rosado v. Wyman,* 397 U.S. 397, 406–07, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), this Court suggested to counsel that inquiries as to the meaning of Section 7 and of the above-mentioned Regulations be made to the Securities Exchange Commission (SEC) and to the Federal Reserve Board (Board). In addition, this Court addressed a letter to the Board dated May 26, 1976. In turn, this Court has received letters from the SEC and the Board dated, respectively, May 27, 1976 and May 28, 1976 and is most grateful to the writers of those letters for their prompt expression of views. Those two letters speak for themselves.[15]

In *Alaska Interstate, Inc. v. McMillan,* 402 F.Supp. 532, 553–54, Judge Stapleton discussed the interplay of section 7(c) and Regulation T as follows:

> Section 7(c) of the Securities Exchange Act of 1934 makes it unlawful for a broker or dealer to extend, or arrange for the extension of, credit without collateral or in contravention of the margin regulations promulgated by the Federal Reserve Board under the authority of Section 7. Regulation T, in turn, prohibits a broker-dealer from extending credit or arranging for the extension of credit collateralized by securities not listed on a national securities exchange. 12 C.F.R. § 220.109. *Since Alaska's tender offer financing is either unsecured or secured in part by unregistered securities, it is clear that Regulation T and Section 7(c) of the '34 Act have been violated if Kuhn, Loeb "arranged" the loan from Chemical Bank.* * * * The central legal question raised by defendants' charge is the scope of the term "arranging" as used in Regulation T. [Emphasis added; footnotes omitted.]

Defendants originally, as a threshold matter, took the position that Regulation T and Section 7(c) of the 1934 Act are inapplicable to tender offers in general. Judge Stapleton's comments and the opinions expressed in the SEC and Board letters are to the contrary—and, in this Court's opinion, convincingly so. While certain SEC "no action" letters have been submitted to this Court by defendants in support of its position, it would appear that each of those letters deal with factual patterns not present herein. However, in any event, this Court notes the SEC's comment that those letters do not "reflect the opinions of the" SEC and agrees with the SEC that "citation of those letters as precedent for interpreting the federal securities laws * * * is inappropriate".

For the reasons set forth in the Board's letter, this Court concludes that Regulation T applies to Empire's tender offer if, as the Board has stated (at pp. 4–5), (1) Blyth Eastman in fact "arranged" the lending undertaking from Continental to Empire which Empire allowed to expire and (2) "the Mercantile loan with a 90% participation by Continental is, in fact, substantially the same credit as that initially committed by Continental." In this preliminary injunction setting—and only for purposes relating thereto—this Court finds that on the present state of the record there is substantial reason to believe that Blyth

---

15. Copies of the three letters are appended hereto as Appendices F, G and H, respectively.

Eastman *arranged* the initial Continental loan and that the Mercantile loan is substantially the same credit represented by the initial Continental undertaking. As to what constitutes "arranging", the analysis set forth in *In the Matter of Sutro Bros. & Co.,* [1961–64 Transfer Binder] CCH Fed. Sec.L.Rep. (1963) ¶ 76,913 at 81,388–89, supplies appropriate guidelines:

* * * [N]o detailed analysis is required to determine that an arranging is involved when the broker procures or negotiates financing for the customer by another. We think it unnecessary to attempt to define the various circumstances under which many other specific acts short of procuring or negotiating might involve the broker in an unlawful arranging. But we think it clear that when a broker permits himself to become the intermediary between customer and factor with respect to the customer's account or dealings with the factor, as by conveying the customer's communications or instructions to the factor or by responding to requests or directives of the factor concerning the customer's transactions, the broker becomes so involved in the extension or maintenance of credit for the customer by the lender as to be held to be arranging. These are activities in relation to the credit absent which the credit would not be supplied by the factor. If the broker acts for the customer or the factor in these matters, he has involved himself in the financial arrangement which are entirely unrelated to his functions of executing his customer's orders and following the customer's instructions as to delivery of securities and payment. If the credit provided the customer exceeds the amount which the broker could himself extend, we think the broker has violated Regulation T. * * * [Footnote omitted.]

The activities of Thompson and Blyth Eastman are detailed *supra* in this Court's findings of facts. Those findings themselves establish a strong probability that "but for" the activities of Thompson and Blyth Eastman, Empire would not have obtained the credit by which it presently intends to finance its tender offer. In that connection, the unsuccessful efforts of Empire to obtain financing prior to Thompson's intercession on Empire's behalf with Continental raise a possible inference of great weight that Thompson's activity was a proximate cause of Empire's ability to obtain the initial Continental loan. This Court notes that officials of both Continental and Mercantile have stated in their depositions that Thompson's activities were not a factor in the obtention of credit by Empire from Continental and Mercantile. Nonetheless, this Court, is of the view that plaintiff has established a serious question as to whether Thompson's activities constituted an arranging of the initial Continental credit. In turn, the sequence of events which followed Empire's permitting the Continental loan to expire supply in and of themselves the link between that lapsed financing by Continental and the replacement financing, quickly arranged, from Mercantile with a 90% Continental participation.

In *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), the Court stated, in a case involving sections 17 of the Securities Act of 1930 and section 10(b) of the Securities Act of 1934 that a party—

* * * may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

 In this case, the facts found by this Court *supra,* in this preliminary relief context only, support the conclusion that Empire allowed the initial Continental lending undertaking to lapse after receiving advice from counsel with regard to a possible Regulation T violation by Blyth Eastman and that Empire subsequently entered into the agreement with Mercantile. If that latter agreement is a substantial continuation of the lapsed one, then there is a strong probability Empire aided and abetted the ulti-

mate conclusion of a two-step transaction in violation of Regulation T.

Pargas, after the Federal Reserve Board addressed its letter to this Court, has asserted a violation by Empire of section 7(f) of the Securities Exchange Act. That section was added to that Act in 1970 and provides in pertinent part:

(1) It is unlawful for any United States person * * * to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender * * for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited. * * *

Defendant contends that section 7(f) is part of the Foreign Bank Security Act and is directed at foreign loans for tender offers by foreign sources and thus is not applicable to Empire's domestic tender offer.[16] No legislative history study has been presented by counsel to this Court as to section 7(f). Nor does this Court have available to it the views of the SEC or of the Board. Under the circumstances, this Court will not at this time express any views as to that issue, particularly since the resolution of the section 7(f) issue is not necessary at this juncture of this case.

There remains, however, the question of whether Pargas possesses standing to obtain other than disclosure relief in connection with what this Court has sometimes herein alluded to as "the Regulations issues". Empire in no way disputes the necessity of full and complete disclosure in the amended tender offer as to the legal status of Empire's current financing arrangements. But Empire does urge that even if those arrangements are illegal, and even if Empire has committed a violation of law in connection therewith, which Empire of course denies, Pargas does not possess the requisite standing to challenge and obtain

any relief, injunctive or otherwise, in connection with the same. The issue of standing to raise issues of the type alluded to herein as "the Regulations issues" has been discussed in certain cases, including *D–Z Investment Co. v. Holloway,* [1974–1975 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,-771 at 96,562 (S.D.N.Y.1974); *Nachman Corp. v. Halfred,* [1973–1974 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,455 (N.D.Ill. 1973); and *Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp.,* 303 F.Supp. 1354 (S.D. N.Y.1969).

In *Nachman Corp. v. Halfred, Inc., supra* at 95,594, Judge McLaren wrote:

The threshold question is whether Nachman is entitled to maintain an action to enforce § 7(f). Prior to the enactment of subsection (f) in 1970, § 7 prohibited only the excessive extension, but not receipt, of credit. An implied right of action by market investors has been recognized by the courts as an effective means of enforcing this prohibition. See, e. g., *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1140 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *Spoon v. Walston,* 345 F.Supp. 518, 521 (E.D.Mich.1972). Strangers to the transactions in which the credit was extended have been held to have no right of action, however. *Robbins v. Banner Indus., Inc.,* 285 F.Supp. 758, 760 (S.D.N.Y.1966); *Meisel v. North Jersey Trust Co.,* 218 F.Supp. 274, 276–77 (S.D.N.Y.1963); *cf. Natkin v. Exchange Nat'l Bank,* 342 F.2d 675, 676–77 (7th Cir. 1965). Thus, Nachman, as an outsider to the financing of Halfred's purchases and ownership of Nachman stock, would not have been able to maintain an action to enforce the margin regulations as to these transactions under § 7 prior to its amendment.

Further (at 95,594), the Court, after discussing section 7(f) and *Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp., supra,* concluded:

dealing with an entirely domestic transaction, did not mention the foreign vs. domestic factor.

---

**16.** *But see Nachman Corp. v. Halfred,* [1973–1974 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,455 (N.D.Ill.1973), in which the Court,

\* \* \* But this does not vary, and *MGM* does not appear to hold otherwise, the principle that strangers to margin transactions have no right under § 7 to maintain an action complaining of the violations themselves.

In *Nachman,* Judge McClaren characterized (at 95,592) certain transactions as not constituting tender offers. In *D–Z Investment Co. v. Holloway, supra,* in which he cited and referred to *Nachman* with regard to the issue of standing, Judge Wyatt (at 96,562) made clear that the transactions involved were not tender offers. In neither of those cases, nor in any other case called to this Court's attention, has there been present the issue of whether a target company has standing to assert alleged violations of Regulation T, related Regulations, or Section 7, as opposed to violations of section 13 and/or 14 for failure to disclose related to such Regulations and/or section 7 questions. The issue of standing herein comes most sharply into focus if one assumes, *arguendo* only of course, that (a) Empire's financing might not in the future continue to be available in whole or in part because Mercantile and/or Continental are proscribed in a Court or administrative proceeding from making payments of sums to Empire under their outstanding financial commitments to Empire, and/or that (b) Empire is proscribed in any such proceeding from accepting all or part of such loans, and/or that (c) Empire should be required to repay any sums it has taken down from Mercantile, because the loan arrangement is deemed to have been unlawfully made and/or received. If, by the time any one or more of those events may have occurred, Empire has been permitted, as counsel for Empire urge, to pay for and take title to a bloc of shares of Pargas stock, tendered in response to Empire's tender offer, as large as 60% of Pargas' stock, Empire may have to divest itself of all or some of such stock of Pargas or, if Empire is permitted to retain all or most of the same, to attempt to arrange substitute or successor financing. Those stockholders of Pargas who do not tender their stock to Empire or whose tenders are not fully accepted and who therefore remain as stockholders of Pargas, and also Pargas as an entity, may well be adversely affected by such developments. Accordingly, they are hardly "strangers" to them. There seems every reason why Pargas, as the target company, should not only possess standing to require Empire in its amended tender offer to disclose legal and other problems relating to the Regulations issues, but also to seek appropriate relief from violations of law stemming from those issues.

The Supreme Court has indicated that, in determining whether a plaintiff possesses standing to challenge an alleged violation of a federal statute, he must establish his own personal stake in the matter, and also establish that he is subject to injury flowing from such violation and that the interest sought to be protected by him is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). *See also Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *and see* the standing cases cited in *Fouke v. Mandel,* 386 F.Supp. 1341, 1347–1353 (D.Md.1974). While Regulation T, the other Regulations, and the section 7 provisions are aimed mainly at the flow of credit, that aim can be furthered by private action. *See J. I. Case Corp. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *But see also* the limitations on that approach applied in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). But in any event, a supplemental aim of those regulations and statutes seemingly is to protect those *not* strangers to transactions illegal thereunder. And that supplemental aim would appear to provide standing herein in any event.

Having delved so deeply into the standing question as it relates to the Regulations issues, this Court nevertheless notes that that issue seemingly would not need to be resolved in this case at this time under the time pressures and limitations which exist, if this Court's June 2, 1976 Order—and this

Court's refusal which underlies that Order to permit Empire to pay for and take title to a bloc of stock of Pargas as large as 60%, albeit subject to strict control and possible later divestiture—is upheld on appeal as having been appropriately issued for antitrust reasons. If the need for the issuance of preliminary injunctive relief were related solely to the need for additional and appropriate full disclosure in an amended tender offer, under sections 13 and 14 of the '34 Act, a preliminary injunctive decree, permitting Empire to go forward with its tender offer and requiring Empire to hold separate all of Pargas' stock which Empire pays for and acquires title to pursuant to the tender offer, might well be appropriate. As also indicated *supra,* this Court believes that its June 2, 1976 Order and the type of preliminary injunctive relief provided for therein is needed appropriately to protect Pargas in the light of the alleged antitrust violations and the factual record to date relating to the same. This Court would hold that view even if none of the Regulations issues were present in this case. If this Court's June 2, 1976 Order is affirmed on antitrust grounds independently of the presence of the Regulations issues, this Court will, unless it is directed to the contrary by the Fourth Circuit [17] afford to counsel on both sides, after such appeal has been decided, the opportunity further to brief and argue in this Court the Regulations issues while the case is readied for trial on all issues. However, if the Fourth Circuit is of the opinion that this Court's June 2, 1976 Order should not have issued on the basis of antitrust reasons and/or for other reasons unrelated to the Regulations issues, then the immediate question will seemingly arise as to whether that Order should have issued solely because of the Regulations issues. Assuming that that question is before it at this time, and on the basis of its consideration and study of the factual and legal presentations and studies made to and by it to date, this Court concludes that Pargas has standing to assert that Empire's financing violates Regulation T and that Empire aided and abetted the same. This Court further concludes that Empire should be enjoined as set forth in this Court's June 2, 1976 Order because Pargas has met the burden of sufficiently establishing its probability of success in connection with those assertions and has thus established its right to such form of preliminary injunctive relief under the standards and for the reasons discussed *supra.* Accordingly, this Court is of the view that its Order of June 2, 1976 is required even if only because of the existence of the Regulations issues. Counsel for defendants have asserted that if such an Order is predicated only upon grounds relating to the Regulations issues, Empire will either seek a speedy separate trial or summary determination of those issues, or attempt to secure new financing. Those opportunities will of course be made forthwith available to Empire by this Court if the Fourth Circuit's determinations on appeal so require.

### Bond

Federal Civil Rule 65(c) provides in part:

(c) *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. * * *

Defendants did not seek any security with regard to this Court's Orders of May 17, 1976 and May 26, 1976 but seek the same in the amount of $3,700,000 in connection with this Court's June 2, 1976 Order if that Order is continued in force and effect

---

17. Defendants have stated that they expect to note an appeal forthwith upon the filing of this opinion, if this opinion leaves outstanding (as it does) this Court's June 2, 1976 Order, and to seek the fastest possible review by that appellate court. As counsel have been informed, Chief Judge Haynsworth has authorized this Court to state that if such an appeal is so noted, the Fourth Circuit will hear oral argument in connection with the same on Friday, June 11, 1976, at 2:00 P.M. Counsel on both sides have stated that that expedited schedule is acceptable to them.

from and after today's date. Plaintiff has offered to post a corporate security bond in the amount of $1,000,000. For reasons stated *infra* this Court is today entering an Order requiring the posting of a bond in that latter amount.[18]

The general principles applicable in connection with determination of the amount of an injunction bond are set forth as follows in 7 J. Moore, Federal Practice and Procedure ¶ 65.09, at 65–94, 65–95 (1975 ed.):

> The requirement of security is intended to protect the party restrained or enjoined, as the case may be, against "costs and damages" incurred or suffered by the party wrongfully restrained or enjoined. It is not intended to cover payment of such sum as the court may decree to be paid on the merits of the case, but, on the contrary as we have said, to cover "costs and damages" directly sustained as the result of an improvident issuance of the restraining order or preliminary injunction.
>
> Bearing in mind the purpose of security, the amount of security is to be determined by the trial court in the exercise of a sound discretion. Necessarily, if a restraining order is granted at the beginning of an action, the amount of security adequate for a defendant's protection is a matter of estimate in light of the circumstances of the case and the fact that the duration of the restraining order is limited in time; even at the *preliminary injunction* stage the amount remains an estimate; *although at this point the development of the case* and the court's decision to grant a preliminary injunction probably make the estimate less conjectural, even though the preliminary injunction has no fixed time limit to run. And so long as the restraint or injunction continues a party may move the court to increase or reduce the amount of security. [Emphasis supplied; footnotes omitted.]

Further, the amount of damages which defendants can in any event recover for an inappropriately entered injunction must be shown to have been proximately caused by the injunction and may not be based upon speculation or conjecture. *Greenwood County v. Duke Power Co.,* 107 F.2d 484, 488 (4th Cir. 1969), *cert. denied,* 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014 (1940); 11 C. Wright and A. Miller, Federal Practice and Procedure § 2973, at 655 (1973 ed.). A loss of an important business opportunity of the type Empire is fearful will occur herein, if this Court's June 2, 1976 Order remains outstanding until final judgment is entered and that judgment is in favor of defendants, may perhaps provide a basis for award to Empire of damages under the bond plaintiff is being required to post at this time. However, it may be that no such damages can be so awarded unless plaintiff is ultimately determined to have prosecuted the within suit maliciously and without probable cause. *Greenwood County v. Duke Power Co., supra.* In *Greenwood* Judge Parker reviewed the authorities which seem so to indicate. Confronted by the suggestion of plaintiff's counsel in *Elco Corporation v. Microdot, Inc., supra,* that Professor Moore had indicated that the law requires a showing of something approaching malicious prosecution before damages growing out of the grant of a preliminary injunction can be obtained by a defendant, Judge Stapleton responded "Gee Whiz".[19] This Court silently but similarly initially responded to plaintiff's written presentation herein as to bond. Thereafter, however, this Court carefully read *Greenwood*. Nevertheless, even assuming that this Court has the power to grant such damages on a less stringent basis, this Court finds fair and reasonable plaintiff's suggestion that the bond be in the amount of $1 million. Pargas bases its proposal of that figure on the grounds that $1 million is the difference between the total dividend payments Empire can expect to receive on 2

---

18. A copy of that Order is appended hereto as Appendix I.

19. *See* Transcript of the March 23, 1976 hearing before Judge Stapleton, at p. 8 (attached to Memorandum submitted by plaintiff in this case with respect to the amount of bond).

million shares of Pargas stock (60% of the outstanding shares of Pargas common stock) during a one-year period and the total interest payments Empire can be expected to pay in one year on the bank borrowings it will take down in order to finance the purchase of such a number of shares. Empire's $3,700,000 bond proposal is based on applying a 10% calculation to the cost of buying 2 million shares at the $18.50 per share tender offer price. The 10% figure is seemingly not otherwise explained. While the setting of a bond amount is certainly an exercise in the application of an imprecise legal standard, the $1 million figure which Pargas has proposed would seem as high a figure as should be established.[20] That is particularly so when the speculative elements of Empire's present position are subjected to careful analysis.

Empire claims that it will lose a favorable and important business opportunity under this Court's June 2, 1976 Order, if the latter turns out eventually to have been improvidently granted, because—

(a) Present market conditions, and financing now available, are favorable to Empire and may change and disappear before Empire, pursuant to final judgment in this case, is permitted to proceed to buy and pay for stock of Pargas for which Empire has made its tender offer.

(b) Empire will lose the current momentum of its tender offer program.

(c) The time may never be as ripe again as it is today.

But there are a lot of hurdles in Empire's path before Empire can ultimately win this case sufficiently to be enabled to attempt successfully to complete its current tender offer program. Those hurdles include—

(1) Empire must file and proceed under an amended tender offer which meets all Securities Exchange Commission disclosure requirements. That hurdle, it would ap-

pear, is one Empire can be reasonably expected to achieve.

(2) If that amended tender offer is not consummated prior to July 1, 1976, Empire's amended tender offer must apparently pass muster under Maryland's new anti-takeover law discussed *supra*. This Court, at this time, proceeds on the assumption that Empire will be able to meet that test.

(3) If Pargas has standing to raise the Regulations issues as this Court has held *supra*, Empire must successfully defend against the challenge that Empire's current financing is not in accordance with applicable legal requirements, or, in the alternative, Empire must obtain new financing which is so in accordance. As of this date, this Court has concluded that Pargas has established a sufficient probability of success to entitle it to preliminary injunctive relief in connection with the Regulations issues alone. As to whether Empire can obtain new financing, this Court has as of today only the conclusory assertion of Empire's counsel that it can do so.

(4) Empire must successfully defend against all antitrust challenges or, in the alternative, at the very least, successfully propose a satisfactory partial divestiture program. At this time, in this Court's opinion, Pargas has established a sufficient probability of success to entitle it to preliminary injunctive relief on antitrust grounds. If Pargas ultimately prevails under the Clayton and/or Sherman Acts, there is no way of knowing at this time whether any cure by Empire will be feasible. In that connection, a $1 million bond seems more than ample, particularly since this Court can require an increase in the bond amount at a later date, prior to final judgment in this case, if such an increase should later prove appropriate.

### Conclusion

If at the conclusion of this litigation defendants seek to recover damages against plaintiff or upon the bond, defendants will

---

**20.** The dividend-interest-difference approach of Pargas may not be the best or the only one. However, in this Court's opinion it is at least as good if not better than the unexplained choice by Empire of 10% of the tender purchase price of 60% of the stock of Pargas.

need to bear the burdens discussed *supra*. But at this date, in pursuance of its quest for preliminary injunctive relief, plaintiff Pargas bears the burden of establishing, in accordance with the standards explicated *supra*, both *whether* preliminary injunctive relief should be granted and *what type* of relief should be ordered. As noted *supra* defendants have indicated, while continuing to contend that *no* preliminary relief should have been decreed *or* should be continued in force and effect, their desire to appeal at this time only with regard to what type of relief should be ordered. In that context defendants urge that antitrust considerations do not merit a stop-type of order. Further, defendants urge that questions relating to the Regulations issues do not merit such an order. In that latter regard, defendants argue lack of standing by plaintiff. Further, defendants argue that if plaintiff does possess standing, and if a stop-type order is not merited for antitrust reasons, then defendants are entitled either to as fast a disposition as reasonably possible on all factual and legal questions relating to the Regulations issues, or the opportunity to seek new financing and to disclose same in an amended tender offer. As to the position of defendants stated in the immediately preceding sentence hereof, this Court is in agreement with the same. As to standing in connection with the Regulations issues, this Court's position as to the existence of standing is set forth *supra*. Indeed, there is little or nothing this Court desires to add at this time with regard to the Regulations issues except the following: (1) if Pargas has standing with relation to those issues, it will do Pargas no good to win ultimately on those issues and then discover that Empire may not be in a position to pay back to Mercantile and to Continental sums of money Empire has taken down and received under its loan from those banks; (2) this Court's views in connection with the Regulations issues comprise an additional reason for the need for a stop-type of order. But, in so stating, this Court also emphasizes its view that Clayton Act reasons, independently and in and of themselves, require such an order, as of this date, and would require such an order even if there were no Regulations issues present herein.

As related *supra*, prior to issuing its June 2, 1976 Order, this Court urged both sides to try to agree upon a mutually acceptable preliminary decree. Pargas informed this Court that while it desired an order such as this Court's June 2, 1976 Order, it would be satisfied, on a compromise basis, with an order (a) pursuant to which Empire could continue to solicit tenders, subject to Pargas' stockholders having the continuing right to withdraw such tenders until the termination of this litigation, but (b) pursuant to which Empire could not acquire title to and pay for any such tendered stock until the termination of this litigation. Empire rejected that proposal. Empire also rejected *consideration* of any proposal which would prevent Empire from acquiring title to and paying for, until the termination of this litigation or seemingly beyond a period of 60 days from the date of filing of an amended offer (60 days being the period so provided in Empire's original May 7, 1976 tender offer), a percentage of Pargas' stock of anything less than 35%. Indeed, Empire's counsel has stated that he had not been authorized by his client to agree to any percentage less than 60%. Empire, in taking that position, urged that a hold-separate type order, under which Empire could pay for and acquire title to all Pargas stock tendered to Empire, had been adopted by a number of courts, citing cases involving tender offers or somewhat similar issues, including *Missouri Portland Cement Co. v. Cargill, Inc., supra* ; *Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.*, 425 F.2d 842, 844–45 (2d Cir. 1970); *Copperweld Corp. v. Imetal*, 403 F.Supp. 579 (W.D.Pa. 1975); *ICM Realty v. Cabot, et al.*, 378 F.Supp. 918 (S.D.N.Y.1974); *Maryland Casualty Co. v. American General Insurance Co.*, 232 F.Supp. 620 (D.D.C.1964). Empire also has cited certain antitrust cases in which the Government sought to enjoin mergers and/or stock acquisitions and in which hold-separate rather than stop type orders were issued, including *United States*

*v. Northwest Industries, Inc.*, 301 F.Supp. 1066 (N.D.Ill.1969); *FTC v. Pepsi Co., Inc.*, 477 F.2d 24 (2d Cir. 1973); *United States v. Wachovia Corp.*, 313 F.Supp. 632 (W.D.N.C. 1970); *United States v. International Tel. & Tel. Corp.*, 306 F.Supp. 766 (D.Conn.1969).

The facts of each such case and the within case are of course different. But those cases as well as other cases relied on by Pargas and which are discussed *infra* establish valuable guidelines. In that context it is to be noted that in *Cargill*, Judge Friendly (at 866) wrote that the target company "was a long way from demonstrating the probability of success ordinarily required to warrant preliminary injunctive relief" and (at 870) that section 7 of the Clayton Act was not "meant to endow incumbent management of a target company with the power to block free trade in its securities unless the anti-trust violation was fairly clear or the potential damage to the corporation decisively outweighed that to the would-be acquirer." (Footnote omitted). Additionally, it is to be noted that in *Cargill*, the tender offeror had already taken down a 19% bloc of the target company's stock before Judge Friendly wrote his opinion (*Id.* at 855). Further, in *Cargill*, the offering and the target companies were not competitors—they were not even in the same line of business, and neither a conventional horizontal or a conventional vertical Clayton Act violation appears to have been asserted (*Id.* at 858–59).

In *Butler*, only disclosure violations, *i. e.*, violations of the securities laws and regulations, and no antitrust violations, were alleged by the plaintiff target company. In *Maryland Casualty* (at 621–22), the Court noted that plaintiff had failed, with regard to its Clayton Act claims, sufficiently to establish the probability of success. In *Copperweld*, the Court termed the plaintiff target company's "case, on the whole, as weak" (at 608), but indicated that plaintiff

was "entitled to try the issue of potential competition" (at 608 n. 91). In *ICM*, which on its facts did not involve a tender offer of the type involved herein, Judge Bonsal concluded (at 925) that a combination of the plaintiff and defendant companies would have a *"de minimis"* effect on competition and that plaintiff ICM had not sufficiently established probable success or raised sufficiently serious Clayton Act questions.

The "hold separate" orders in cases instituted by the Government, which are cited by Empire, also require individual factual analyses. Such government-instituted type of cases sometimes involve stock, title to which has already passed to the acquiring corporation; or a take-over desired by both corporations, which only the Government opposed; or a transfer of assets which can be segregated and later returned; or other factors which differentiate them from a tender offer case such as this one.[21]

In *Elco Corporation v. Microdot, supra*, relied heavily upon by plaintiff, Judge Stapleton concluded (at 755):

> Most importantly, however, I am convinced that the acquisition by Microdot of 51% of Elco's common stock, even subject to restrictions on voting, would exacerbate the problems caused by the uncertainty of Elco's future and result in substantially greater injury to Elco's business during the course of this litigation than if consummation of the tender offer is enjoined. The injury to Elco that would occur if a limited injunction were entered is, I conclude, greater than the injury to Microdot and the tendering Elco shareholders that might be avoided by limiting the relief as defendants request.

Judge Stapleton's opinion was filed on March 23, 1973. Prior thereto, on March 21, 1973 (at Tr. of March 21, 1973, p. 65), the following colloquy between Judge Stapleton and counsel for the tender offeror took place:

---

**21.** As far as this Court knows, no Court has utilized the type of order Empire seeks herein, in a situation in which the probability of the existence of Clayton Act violations has loomed large. Any such order would seem to run counter to public policy as enunciated by sec-

tion 7 of the Clayton Act as well as to subject unfairly to the considerable possibility of substantial injuries the target company and all of its stockholders, or at least in any event, all of its non-tendering stockholders.

THE COURT: How about Elco's [target company's] stockholders? Assuming that you are wrong and Elco wins the case. Would not the Elco stockholders have suffered irreparable injury, those that did not tender, if I let you go ahead with the tender?

MR. HAWKINS: Those that did not tender—

THE COURT: That is a little confusing. Is not the marketability of the Elco stock that has not been tendered going to be affected during the interim period if Microdot [tender offeror] owns 51 per cent of the stock *and if Elco initially wins, won't the market price of the stock of Elco's stockholders who did not tender be depressed by a divestiture of 51 per cent of Elco's stock*? (Emphasis added.)

MR. HAWKINS: You mean the effect on the market of a sale of a block that large?

THE COURT: Yes.

MR. HAWKINS: Well, I am certainly not an expert on this. I would not think necessarily. I would think that block would be sold as a control block and might sell perhaps for exactly the same price as it was bought for, and I wouldn't think the fact that it was sold to somebody else would in itself depress the price of the remaining shares necessarily. But I am not an expert in that area at all, your Honor.

Plaintiff has also referred this Court to Judge Battisti's following observation in *United States v. White Consolidated Industries, Inc.*, 323 F.Supp. 1397, 1399–1400

(N.D.Ohio 1971), a case involving a merger, not a tender offer:

> The defendants argue that under an appropriate "hold separate and apart" order, divestiture would be relatively simple should a permanent injunction issue after a full trial, and that to grant such an order would constitute sound policy. Quite to the contrary, however, it would only further bad policy and its implementation might present, ultimately, horrendous complexity. It would seem, then, that in balancing possible harm to the defendants against probable antitrust violations, there is no question that national interests must take precedence.

And additionally, plaintiff has called attention to *Electronic Specialty Co. v. International Controls Corp., supra*, in which Judge Friendly noted (at 947):

> To afford an opportunity for withdrawal would be the idlest of gestures now, since the ELS stock purchased by ICC at $39 is selling around $26–$27, and compulsory rescission is out of the question.

Of course if Empire agreed and bound itself to rescission, *i. e.*, to tender back to any shareholder, from whom it acquired Pargas' stock pursuant to Empire's tender, such stock upon payment to Empire by the stockholder of $18.50 per share, Empire seemingly could be required to carry out such a rescission. But the Pargas stockholder who tenders, passes title to, and receives payment for some or all of his Pargas shares and who seemingly incurs income tax consequences upon so doing, can hardly be required to buy back such stock. Nor is he conceivably likely to do so at a future date unless Pargas stock is then selling above the price of $18.50.[22]

---

**22.** Pargas has relied in part on evidence disclosing the difficulties Avis has been subjected to in connection with ITT's divestiture of Avis stock. In that regard, the parties herein have submitted affidavit, deposition and exhibit testimony showing comparisons and contrasts between the Pargas and the Avis situations. The Avis situation, of course, deals with stock of much greater dollar value and also 100% of Avis stock, as opposed to the dollar value and the 60% of the Pargas stock which is involved in this case. Accordingly, this Court does not rely to any great degree on the Avis experience. But, on the other hand, that experience certainly does nothing to show that Pargas is *not* subject to the damages discussed at length *supra* in the body of this opinion.

Pargas has also submitted within the last several days an affidavit claiming that Empire has at its Woodsworth, Louisiana branch disturbed the competitive *status quo* by soliciting customers and employees of Pargas to leave Pargas and to join and/or to do business with Empire. This Court, in view of the time pressures, has not been able fully to consider the same; nor has Empire had a sufficient opportunity to respond thereto.

What Empire asks for herein is to put Pargas in a position in which Pargas as an entity, and Pargas' non-tendering stockholders, are subjected to the substantial possibility and indeed the probability of considerable damage even if Pargas is ultimately able to enjoin the tender offer. Additionally, the type of preliminary decree Empire seeks will unfairly put all Pargas stockholders under present pressures of uncertainty. Empire argues that those of Pargas' stockholders who want to sell at the tender offer price are being disadvantaged. But that is always possible in any case in which any tender offer is enjoined, preliminarily or finally. In the light of the record in this case, the serious issues raised by Pargas herein, and the substantial probability of success by Pargas in its quest to enjoin Empire's tender offer upon antitrust grounds alone, as well as also in connection with the Regulations issues, the type of order Empire seeks should not be granted. Further, in the context of careful consideration and weighing of the disadvantages to Pargas of the type of order Empire seeks and of the disadvantages to Empire, and to those of Pargas' stockholders who desire presently to tender and sell at the $18.50 price, of the type of order reflected by this Court's June 2, 1976 Order, the balance of hardships tips sharply in Pargas' favor and requires that this Court's Order of June 2, 1976 be continued in full force and effect, subject to an appropriate $1 million bond being posted by Pargas. A copy of this Court's Order of even date herewith effectuating that determination is attached hereto as Appendix I.*

### APPENDIX A

### ORDER GRANTING APPLICATION FOR PRELIMINARY RELIEF

Upon application of plaintiff for a preliminary injunction with respect to the outstanding tender offer of Empire Gas Corporation for up to 2,000,000 shares of common stock of Pargas, Inc., dated May 7, 1976, as amended ("the Empire Tender") and upon this Court's determination that plaintiff has satisfied the requisite tests for entitlement to preliminary relief herein with respect to certain disclosure, securities and antitrust claims, IT IS HEREBY ORDERED THAT:

1. Empire Gas extend its offer until 5:00 p. m. Chicago time on Friday, May 28, 1976 and agree not to purchase any stock pursuant thereto during such extension.

2. This Court will, within 14 days hereof, enter a further order providing for the following, among other things:

a. Empire may make an amended tender offer for Pargas common stock subject to making certain disclosures as required by this Court, in connection with which a new seven and ninety day withdrawal period will be provided for all shareholders of Pargas whether or not they have already tendered;

b. If such an amended tender offer is made, Pargas may oppose the amended tender offer as permitted by the Court and in accordance with applicable laws and regulations;

c. All Pargas stock tendered and purchased by Empire pursuant to the amended offer will be held separate by Empire pending a trial on the merits of certain antitrust, securities and perhaps other issues;

d. Prior to the trial on the merits of these issues, the stock acquired by Empire may not be voted or encumbered without consent of the Court and both Pargas and Empire will refrain from taking any action without prior approval of the Court, which could be deemed in any way to disturb the "status quo" during the pendency of the litigation.

### APPENDIX B

### EXTENSION OF ORDER OF MAY 17, 1976 GRANTING APPLICATION FOR PRELIMINARY RELIEF

After discussion with counsel for all of the parties and in accordance with the

---

* On June 14, 1976, the Fourth Circuit entered a per curiam affirmance.

agreement of all of the parties, it is hereby ORDERED, this *26th* day of May, 1976:

(1) Paragraph 1 of the May 17, 1976 Order is hereby changed so that the words "until 5:00 p. m. Chicago time on Monday, June 7, 1976" are hereby substituted for the words "until 5:00 p. m. Chicago time on Friday, May 28, 1976".

(2) The first line of paragraph 2 of the said May 17, 1976 Order is hereby changed so that the words "on or before Monday, June 7, 1976" are hereby substituted for the words "within 14 days hereof".

(3) As amended as set forth in the preceding paragraphs hereof, this Court's said May 17, 1976 Order shall remain in full force and effect to and including June 7, 1976.

(4) This Court will await the submission of further memoranda from counsel with regard to the specific details and wording of the further Order of this Court contemplated by and referred to in this Court's said May 17, 1976 Order. This Court and counsel for all parties agree that such a further Order is required in order to effectuate one or more provisions of this Court's May 17, 1976 Order as amended hereinbefore. This Court will, if possible, enter such a further Order on or before June 7, 1976. If that does not prove practical, this Court will discuss with counsel for all parties whether or not this Court's May 17, 1976 Order as amended hereby should be further extended from and after June 7, 1976.

(5) This Court and counsel had tentatively discussed holding a further hearing in this case on Thursday, May 27, 1976, at 10:00 a. m. That hearing will not be held. As set forth hereinabove, this Court will await the submission of further memoranda from counsel on both sides and will confer further with counsel with regard to such submissions in the chambers of this Court at 10:00 a. m. on Tuesday, June 1, 1976.

(6) The Clerk is directed to send copies of this Order to counsel of record.

APPENDIX F

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MARYLAND
BALTIMORE MARYLAND 21202

May 26, 1976

Office of the General Counsel
Federal Reserve Board
Washington, D. C. 20551

Gentlemen:

Re: *Pargas, Inc. v. Empire Gas Corporation* Civil No. K–76–676

This Court has pending before it the above-captioned action brought by Pargas, Inc. against Empire Gas Corporation, et al. for injunctive and other relief against the pending tender offer of Empire for shares of the common stock of Pargas, Inc. One of the issues before the Court in this case is the claim by Pargas that the loan to finance the tender offer was arranged by a broker-dealer in violation of Regulation T. With respect to the Court's resolution of those issues, the Court hereby requests the views of your office with respect to the following questions:

(1) Does Regulation T apply to tender offers in general?

(2) Does Regulation T apply to the tender offer by Empire in this case?

(3) If there is an arranging in violation of Regulation T, is the borrowing pursuant to the loan so arranged a violation of Regulation X?

(4) If there is a violation of either or both regulations, what are the possible effects of such a violation on the loan and on (a) the broker-dealer who arranged it, (b) the borrower, and (c) the lending banks?

This Court has advised the parties that they are free to submit to your office, jointly or separately, a Statement of Facts relating to this particular case, if they feel it would be of assistance and appropriate. The Court will greatly appreciate your re-

sponse to the questions set forth above at your early convenience.

Very truly yours,

(s) Frank A. Kaufman
Frank A. Kaufman

cc: James V. Dolan, Esq.
Robert S. Pirie, Esq.
Official Court File

## APPENDIX G
## SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

May 27, 1976

The Honorable Frank A. Kaufman
United States District Judge for
the District of Maryland
United States Court House
Baltimore, Maryland 21202

Re: *Pargas, Inc. v. Empire Gas Corp.*,
D. Md., Civil Action No. K–76–
676

Dear Judge Kaufman:

At a hearing on May 17, 1976, in the above-captioned action, we understand that Your Honor expressed the desire to be apprised of the view of the Securities and Exchange Commission on the applicability to tender offers of Regulation T, 12 CFR 220, adopted by the Board of Governors of the Federal Reserve System ("Federal Reserve Board") pursuant to Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. 78g. In subsequent conversations with counsel for the plaintiff, we have been advised that the Court specifically desires the view of this Commission whether (1) Regulation T applies to tender offers generally and (2) the Regulation is applicable to the instant tender offer.

As the Court may be aware, it is the practice of this Commission generally to refer requests for interpretations of Regulation T and the other credit regulations—that is, Regulations G, U and X—to the Federal Reserve Board. This Commission, however, is responsible for enforcing Regulation T, and, in consultation with the Federal Reserve Board, institutes enforcement actions to remedy violations of these credit regulations. Accordingly, we have consulted members of the staff of the Federal Reserve Board to ascertain their views with respect to this matter. The staff of the Federal Reserve Board also was consulted by counsel in this action; we understand that they are preparing a letter of staff views for the Court, noting the Federal Reserve Board's longstanding position that Regulation T applies to tender offers. The Federal Reserve Board's staff is not aware of any interpretation or court decision which would exempt the instant tender offer from the provisions of Regulation T so long as the Regulation is otherwise applicable under existing Federal Reserve Board interpretation. The Commission's view is not to the contrary.

This Court's oral opinion of May 17, 1976, indicates that some question has been raised during these proceedings whether certain past informal staff advice, in letter form, rendered by the Commission's staff to persons not involved in this proceeding, suggests a different interpretation.[1] As Your Honor may be aware, informal advisory views of our staff are offered to assist persons who may fall within the purview of the statutes administered by the Commission. They are not reviewed by, nor do they reflect the opinions of the Commission, as more fully set forth in 17 CFR 202.1(d).[2] The letters referred to in this proceeding, moreover, are not interpretative positions of our staff. Rather, they are so-called "no-action" letters, in which the staff receives a description of a proposed course of activity, and indicates, based on that de-

---

1. The letters referred to are from the staff of this Commission regarding (1) Kidder, Peabody & Co., Inc. (availability date November 1, 1973), (2) Goldman, Sachs & Co. (availability date October 11, 1971), and (3) T.A. Associates (availability date April 18, 1974).

2. 17 CFR 202.1(d) provides in part that such "opinions expressed by members of the staff do not constitute an official expression of the Commission's views. . . ."

scription alone, whether or not the staff would recommend enforcement action to the Commission if the proposed activity or transaction actually should be effected. The citation of these letters as precedent for interpreting the federal securities laws, therefore, is inappropriate. *Cf., Reserve Life Insurance Co. v. Provident Life Insurance Co.,* 499 F.2d 715, 722, n. 9 (C.A. 8, 1974).

In any event, it should be noted that two of these letters (regarding Kidder, Peabody and T.A. Associates) do not appear to be directly relevant to the issue before the Court. These two letters involve the question whether Regulation T applies to the arranging of credit by a broker-dealer through the private placement of debt securities for the purpose of purchasing or carrying a margin security, albeit a prior tender offer was involved in the Kidder, Peabody letter. And, as is stated in both letters, in the absence of a Federal Reserve Board policy on this question at that time, the staff determined that it would have been inappropriate to recommend enforcement action to the Commission. The Court should note, however, that a recent amendment to Section 7(a) of Regulation T, excepting certain private offerings from the application of the Regulation, would appear to be consistent with the no-action position taken in these letters. See 40 F.R. 53379 (Nov. 18, 1975).[3]

We have not, consistent with our traditional approach to the expression of *amicus* views in district court, reviewed the factual record compiled in this action, and we have not, therefore, addressed ourselves in this letter to the question whether there has, in fact, been a violation of Regulation T here.

---

**3.** The third staff no-action letter in question, regarding Goldman, Sachs and Co., expressly disavowed an interpretation of the applicability of any statutory or regulatory provisions to the transactions in question, stating rather the staff's disinclination to recommend enforcement action to the Commission under the circumstances. This is consistent with the limited scope of a no-action letter. In any event, to the extent that that letter may appear to have been predicated upon the general view that Regula-

Sincerely,

(s) Harvey L. Pitt
 Harvey L. Pitt
 General Counsel

cc: All Counsel
 Assistant Director
 Office of Saver and
 Consumer Affairs
 Board of Governors of the
 Federal Reserve System

### APPENDIX H

### BOARD OF GOVERNORS
of the
### FEDERAL RESERVE SYSTEM
### WASHINGTON, D. C. 20551

May 28, 1976

The Honorable Frank A. Kaufman, Judge
United States District Court for the
 District of Maryland
United States Court House
Baltimore, Maryland 21202

Dear Judge Kaufman:

Re: *Pargas Inc. v. Empire Gas Corporation, et al;* Civil Action No. K76–676, United States District Court for the District of Maryland

The Court has requested the views of the Office of the General Counsel on four questions relating to an issue raised in the above-captioned case. We have been asked by the Board's General Counsel to respond to this request as this Division has been assigned the responsibility for the administration and interpretation of the Board's regulations under section 7 of the Securities Exchange Act of 1934 ("Exchange Act").

A claim has been made by Pargas, Inc. ("Pargas"), in an action seeking injunctive

tion T does not apply to a broker-dealer's arrangement of a bank loan obtained to refinance part of a previous loan used in a tender offer, it is inconsistent with the Commission's position, as stated above, and is not entitled to any weight as the view of this agency. The bank loan there seems to us to have involved the arranging of credit by a broker-dealer for the purpose of carrying securities in a tender offer situation and is not within any exception to Regulation T of which we are aware.

and other relief, that a loan to finance a tender offer by Empire Gas Corporation ("Empire") for the stock of Pargas, a security listed on the New York Stock Exchange, was arranged by a broker-dealer in violation of the Board's margin regulations.

The Court has propounded four specific questions with respect to that claim and asked the Board's staff to aid its deliberations by responding to them. It should be noted that the following views are solely those of the Board's staff and that because of time constraints, it has not been possible to present these questions to the Board for its consideration. The questions and our responses follow:

### QUESTION NO. 1

Does Regulation T apply to tender offers in general?

### RESPONSE TO QUESTION NO. 1

Yes. Except as provided in section 220.-7(a) of the regulation, which is quoted below, Regulation T applies to credit extended, maintained or arranged by a broker or dealer for the purpose of purchasing or carrying any securities (other than exempted securities). Accordingly, it is our opinion that Regulation T applies to credit used to purchase securities pursuant to a tender offer.

### QUESTION NO. 2

Does Regulation T apply to the tender offer by Empire in this case?

### RESPONSE TO QUESTION NO. 2

Section 220.7(a) of Regulation T (12 CFR 220.7(a)) states:

*Arranging for loans by others.* A creditor may arrange for the extension or maintenance of credit to or for any customer of such creditor by any person upon the same terms and conditions as those upon which the creditor, under the provisions of this Part, may himself extend or maintain such credit to such customer, but only upon such terms and conditions, except that this limitation shall not apply to the arranging by a creditor:

 (1) for a bank subject to Part 221 of this Chapter (Regulation U) to extend or maintain credit on margin securities or exempted securities, or

 (2) for any person to extend or maintain credit for the purpose of purchasing or carrying a security (including sale of a security with instalment payments or other credit features) in a transaction which is exempt from the registration requirements of the Securities Act of 1933 by virtue of section 4(2) of that Act (15 U.S.C. 77d(2)) *Provided, That:*

 (i) the credit to be extended or maintained will not violate the provisions of Parts 207 and 221 of this Chapter; and

 (ii) the credit will not be used to purchase or carry a security that is publicly-held. For the purpose of this paragraph, a security shall be deemed to be "publicly-held" if it is (a) a security of a class that is registered, or will be required to be registered (assuming existing circumstances requiring registration continue to prevail) within 120 days after the last day of the fiscal year of the issuer, under section 12 of the Act or would be required to be registered except for the exemptions provided by paragraphs (2)(B) and (G) of subsection 12(g), or (b) a security of a class any portion of which was registered under section 5 of the Securities Act of 1933 (15 U.S.C. 77e) and in connection with which the issuer is required to file periodic reports under section 15(d) of the Act.

From the information we have received, the following alleged facts are relevant to our consideration of this question. Blyth, Eastman, Dillon & Co., Inc. ("Blyth, Eastman"), a broker-dealer, placed a telephone call to Continental Illinois National Bank & Trust Co. of Chicago ("Continental") for the purpose of obtaining the financing for a cash tender offer by Empire for the stock of Pargas. Subsequently, a loan commitment of $50,000,000, was made to Empire by Continental. (Blyth, Eastman may also have participated in other telephone conversations or meetings concerning the tender offer). Because a question was raised as to whether or not the telephone call by Blyth,

Eastman to Continental might be viewed as in contravention of Regulation T, it was decided that the loan commitment should be permitted to lapse. Empire then contacted Mercantile Trust Company, N.A. ("Mercantile") of St. Louis, Missouri, one of the two banks with which it had regular banking relations and an outstanding loan. Empire's other bank, First National Bank of Chicago, had previously rejected Empire's request for the financing. Mercantile, however, was a much smaller bank than Continental and was limited in what it could lend under banking laws to a sum considerably less than the $50,000,000 needed. Mercantile was advised of the prior Continental commitment and the circumstances which led to its lapse. Mercantile, after agreeing to act as agent bank in the loan, decided that its participation must be limited to $5,000,000; it therefore contacted Continental, one its [sic] principal correspondent banks, and received their agreement to participate in the loan for a sum of $45,000,000.

Blyth, Eastman, comes within the term "creditor" which is defined in section 220.-2(b) of Regulation T as "any broker or dealer including every member of a national securities exchange."

The term "customer" is defined in section 220.2(c) of Regulation T to include "any person or group of persons acting jointly, (i) to or for whom a creditor is extending, *arranging* [emphasis supplied], or maintaining any credit . . ." Under this definition, Empire would be a customer of Blyth, Eastman if the loan was arranged by Blyth, Eastman.

Accordingly, it is our opinion that Regulation T applies to this tender offer if the Court finds (1) that the activities of Blyth, Eastman in seeking to secure financing for the tender offer by Empire constituted an "arranging" of credit within the meaning of the Exchange Act and Regulation T and (2) that the Mercantile loan with a 90 per cent participation by Continental, is, in fact, substantially the same credit as that initially committed by Continental. We regret that we are unable to offer more definitive advice in this response. It is our view that the facts, as ultimately determined by the Court, are critical to the answer.

## QUESTION NO. 3

If there is an arranging in violation of Regulation T, is the borrowing pursuant to the loan so arranged a violation of Regulation X?

## RESPONSE TO QUESTION NO. 3

No. Regulation X (12 CFR 204) was adopted by the Board to be effective November 1, 1971 in order to carry out the provisions of Title III of the Foreign Bank Secrecy Act (Public Law 91–508 enacted October 26, 1970). That Act amended section 7 of the Securities Exchange Act of 1934 ("Exchange Act") by requiring, for the first time, that borrowers comply with the margin regulations applicable to the appropriate category of lenders when obtaining credit for the purpose of purchasing securities.

Section 224.2(a) of Regulation X provides:
*Credit obtained from within the United States.*

A borrower shall not obtain any purpose credit from within the United States unless he does so in compliance with the following conditions.

 \* \* \* \* \* \*

(2) Credit obtained from a broker/dealer shall conform to the provisions of Part 220 (Regulation T), which is hereby incorporated in this part (Regulation X). When the term "broker/dealer" is used in this part (Regulation X), it means a person who is a broker or dealer, including every member of a national securities exchange, and includes a foreign branch or subsidiary of a broker/dealer." [sic]

(3) Credit obtained from a bank shall conform to the provisions of Part 221 (Regulation U), except for section 221.-2(i). Except for such section, Part 221 (Regulation U) is hereby incorporated in this part (Regulation X). When the term "bank" is used in this part (Regulation X), it means a bank that is subject to Part 221 (Regulation U).

This provision of Regulation X makes it illegal for a borrower to obtain credit from

a broker-dealer in excess of what the broker-dealer can lend. It does not appear that the specific language of Regulation X makes it illegal for the borrower to obtain credit "arranged" by a broker-dealer in excess of what the broker-dealer could extend, provided the credit terms comply with the provision of the regulation applicable to the lender, which in this case, would be Regulation U. We note, however, that an illegally arranged loan, although it may not violate Regulation X (because it does not violate Regulation U), could possibly be actionable through other rules of law, such as those concerned with "aiding and abetting". As stated by the Court in *Bronner v. Goldman*, 361 F.2d 759, 763 (1st Cir. 1966):

> . . . the policy against broker arrangement of otherwise proper loans can be enforced through the various administrative disciplinary sanctions provided by the Act, or by injunctive relief or even criminal prosecution as such sanctions may be applicable in particular circumstances to a broker or anyone who aids and abets his misconduct." [1]

## QUESTION NO. 4

If there is a violation of either or both regulations, what are the possible effects of such a violation on the loan and on (a) the broker-dealer who arranged it, (b) the borrower, and (c) the lending banks?

## RESPONSE TO QUESTION NO. 4

It is our view, as stated in response to Question No. 3, that there would be no violation of Regulation X if a credit which a bank would be allowed to extend under the terms of Regulation U, is arranged by a broker in violation of section 220.7(a) of Regulation T. Furthermore, the effect of any violation on the loan itself appears to us to be a question for the Court to decide as it will involve a determination of the rights of the various parties concerned. We wish to indicate, however, our agreement with the reasoning of the Court in *Alaska*

*Interstate Company v. McMillan*, 402 F.Supp. 532, 556 (D.C.Del.1975), which ascribed to the Board a regulatory concern with credit flowing into the market which is obtained for a customer through the efforts of a broker-dealer. Accordingly, our discussion will be confined to the possible effects of a Regulation T violation on the broker-dealer, the borrower and the lending bank.

### Effect on the broker-dealer

A broker-dealer who has arranged a prohibited loan, of course, violates Regulation T. It is our opinion that such a violation could subject the person to possible action by the Securities and Exchange Commission ("SEC") under section 21 of the Exchange Act, (15 U.S.C. 78u(d)), to possible recission of any relevant contract under section 29(b) of that Act (15 U.S.C. 78cc(b)), to possible disciplinary action by any self-regulatory agency of which the broker-dealer is a member pursuant to section 6(b)(6) of the Act, (15 U.S.C. 78f(b)(6)) as well as to suits brought under the implied right of action which the Courts have consistently recognized in this area when initiated by an aggrieved person under basic tort law which allows recovery to a proper person injured by a violation of a statute intended for the protection of persons of that class.[2]

### Effect on the borrower

If a loan has been illegally arranged, the borrower for whom the loan was arranged could be found liable for aiding and abetting a violation of Regulation T. It is our opinion that the borrower could be subject to injunctive action by the SEC under section 21 of the Act (15 U.S.C. 78u(d)) and to suits by a proper party brought under the implied right of action mentioned above based on tort law.

### Effect on lending banks

It is our view that a bank should not participate in a loan which has been ar-

---

1. See also: Federal Reserve Board Interpretation at 12 CFR 220.111; *Bondy v. Chemical Bank*, CCH Fed.Sec.L.Rep. ¶ 95,360 (S.D.N.Y. 1975).

2. See *Goldenberg v. Bache & Co.*, 270 F.2d 675, 680 (C.A.5, 1959).

ranged by a broker-dealer in violation of section 220.7(a) of Regulation T, even though the loan would be permitted under Regulation U, because such act or practice would aid and abet a violation of section 7(c) of the Exchange Act (15 U.S.C. 78g(c)) and section 220.7(a) of Regulation T. If the appropriate federal banking regulatory agency had reasonable cause to believe that such participation was an unsafe and unsound practice in conducting the business of such bank or constituted a violation of the law, the banking agency could institute cease-and-desist proceedings pursuant to section 8(b)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1818(b)(1)). The bank possibly could also be subject to an action brought by the SEC in its discretion under section 21(d) of the Exchange Act (15 U.S.C. 78u(d)) or a private suit by a proper party in the same manner as explained above.

### Additional Information

The following additional information which may aid the Court in its deliberation is attached:

(1) Board press release dated November 13, 1975, which announced an amendment to section 220.7(a) of Regulation T.

(2) Board letter dated February 27, 1974, relating to the refinancing of bank loans, the proceeds of which were used to purchase stock, in which the Board concluded that it would not regard section 220.7(a) of Regulation T as applicable if the broker-dealer withdrew from the transaction and limited his future relations with the issuer.

(3) Board letter dated August 3, 1973, in which the Board discussed permissible as well as prohibited activities of a broker-dealer in connection with a proposed financing of the purchase of securities involved in the El Paso Natural Gas Co. divestiture.

We hope the above comments will be helpful to the Court in its consideration of this case.

Very truly yours,

(s) Robert S. Plotkin
Robert S. Plotkin
Assistant Director

Attachment

## APPENDIX J

### PRELIMINARY INJUNCTION

This *2nd* day of June, 1976, at 11:40 A.M., the Court having considered the complaint and the affidavits and briefs submitted by the parties, and counsel for the parties having been heard, and the Court having found that the plaintiff has demonstrated a probability of success on the merits and shown that irreparable harm will result to the plaintiff, its shareholders and the public if a preliminary injunction is denied, it is hereby

ORDERED:

1. Defendants are hereby preliminarily enjoined from taking any steps in furtherance of the Offer to Purchase dated May 7, 1976 ("tender offer") of defendant, Empire Gas Corp. ("Empire") for shares of stock of plaintiff Pargas, Inc. ("Pargas").

2. Defendants are hereby preliminarily enjoined from purchasing or acquiring, directly or indirectly, any shares of Pargas common stock not held as of the date of this Order, whether through tender offer or otherwise;

3. The withdrawal period for Pargas shareholders who have tendered their shares pursuant to defendants' tender offer is hereby extended until further order of this Court;

4. This Order will become effective forthwith but is not intended to become final and appealable until this Court enters findings of facts and conclusions of law, and determines the amount of a penalty bond (conditioned for the payment of such costs and damages as may be incurred or suffered by defendants who may be found to have been wrongfully enjoined hereby) which plaintiff shall post as a condition of

this Order. This Court will enter such findings and conclusions and make such determinations at the earliest practicable date after hearing from counsel in chambers on Monday, June 7, 1976.

5. This Court hereby authorizes counsel on both sides to publicize or cause to be publicized this Order subject to applicable laws and regulations.

6. This Order supersedes this Court's Orders filed in this case on May 17, 1976 and May 26, 1976.

7. Either party may move the Court at any time for modification of this Order for good cause shown.